# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

THOMAS POTTS,
Defendant and Appellant.

S072161

Kings County Superior Court
97CM2167

March 28, 2019

Chief Justice Cantil-Sakauye authored the opinion of the court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger, and Simons[*] concurred.
Justice Liu filed a concurring opinion in which Justice Cuéllar concurred.

---

[*]  Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. POTTS

S072161


Opinion of the Court by Cantil-Sakauye, C. J.


This case arises from the robbery and murder of an elderly couple found dead in their home. A jury convicted defendant Thomas Potts of two counts of first degree murder, one count of first degree robbery, and one count of grand theft (from a different victim). (Pen. Code, §§ 187, subd. (a) [murder], 211 [robbery], 487, subd. (a) [grand theft].)[1] The jury found that defendant knew or reasonably should have known that each murder victim was at least 65 years old. (§ 667.9, subd. (a) [elderly victim enhancement].) The jury also found true two different special circumstance allegations — multiple murder and robbery murder — and returned verdicts of death at the close of the penalty phase. (§ 190.2, subds. (a)(3) [multiple murder], (a)(17) [robbery murder].) As relevant here, the trial court found true two prior felony offense allegations; imposed a four-year determinate term based on the age of the victims; imposed a $10,000 restitution fine; denied the automatic motion to modify the verdict; and sentenced defendant to death. (§§ 190.4, subd. (e) [automatic motion], 1202.4 [restitution].) This appeal is automatic. (§ 1239, subd. (b).) We modify the judgment by striking the four-year determinate term and otherwise affirm.

---

[1]     All unspecified statutory references are to the Penal Code.

## I. BACKGROUND

### A. Guilt Phase

#### 1. Prosecution case

##### a. Crime scene

Fred and Shirley Jenks made their home in Hanford, California. A florist attempted to deliver them flowers on the morning of August 5, 1997. When the Jenkses' doorbell went unanswered, the florist entrusted the flowers to a neighbor rather than leaving them to wilt outside in the summer heat.

That evening, the neighbor went to see whether the Jenkses were home. When their doorbell again went unanswered, the neighbor peered through a glass portion of the front door. Inside, she saw Fred's body — with blood on the floor and splattered on the wall. Police later discovered Shirley's body in the master bedroom. The evidence adduced at trial suggested that Fred and Shirley had each been attacked with a hatchet-type weapon and at least one knife. There was no dispute that the attacks likely occurred the previous day, after 1:00 p.m.

Detective Darrell Walker led the homicide investigation. He observed that drops of blood near Fred's body reached as high as a roughly ten-foot-tall ceiling. Near the body, Walker saw a small metallic pin of the sort used to connect a watch band to a watch face. The watch on Fred's wrist had pins intact. Underneath him, however, was a watch with a missing pin and a partially detached band.

Bloody shoeprints were found at the scene. The prints had a wavy pattern and at least some bore the word "Nike." A print

similar to those seen in several portions of the house also appeared on Fred's back.

Investigators found an open cutlery drawer in the Jenkses' kitchen. One knife was discovered in the Jenkses' pantry, sticking out of a package of cookies. The kitchen sink contained a short-bladed paring knife and a knife sharpener, both of which tested positive for blood. The blood on the sharpener could have come from Fred, but could not have come from Shirley. A longer-bladed boning or filet-type knife was found in the Jenkses' master bedroom, with blood on the knife's handle. Neither Fred nor Shirley was excluded as a potential blood contributor.

The knife in the master bedroom was found underneath various boxes. Although some valuables remained in the room, portions of it had been "ransacked" — with empty jewelry trays and more than 30 empty jewelry boxes left behind. All told, it appeared that at least 200 pieces of jewelry had been taken. By contrast, a different bedroom was found "basically immaculate."

No direct evidence indicated how the perpetrator entered the Jenkses' home. The only window or exterior door that was unlocked, however, was the front door, and glass panes made it possible to see who was outside that door before opening it. There were no signs of forced entry.

### b. Causes of deaths

Armand Dollinger, M.D., performed both autopsies. He testified that Fred suffered "numerous contusions, bruises, abrasions, lacerations, and . . . stab wounds." Twenty-eight separate wounds were visible on the top and back of Fred's head. Several of his fingers were nearly amputated. His chest had been stabbed nine times, causing six wounds to his lungs. His

ribs were fractured in a manner consistent with "[s]omebody forcibly jumping or stomping on . . . either the front or the back of the chest."

Dr. Dollinger opined that the instruments used to attack Fred likely included a knife and "a narrow-bladed hatchet" with a round hammer on the back. It was possible that Fred was stabbed with both the shorter knife in the kitchen sink and the longer knife in the master bedroom. The shorter knife alone may not have been long enough to cause some of Fred's injuries.

Dr. Dollinger identified Fred's cause of death as "open cranial injuries due to multiple blunt trauma and stab wounds of the head. Other contributing conditions, multiple stab wounds of posterior chest with penetrating wounds of the lungs." Blood found in Fred's pleural cavity indicated to Dr. Dollinger that Fred was "probably alive when he sustained stab wounds to the chest," though Dr. Dollinger acknowledged that prior head wounds "might have" killed Fred instantly and collectively left him, "if not already dead, [then] almost dead and dying."

Shirley suffered three main types of injuries. She was struck four times in the head with a hatchet-type weapon, fracturing her skull and causing brain tissue to extrude from a wound. She was stabbed at least six times in the chest, puncturing her heart. And she was twice slashed across the throat.

Dr. Dollinger described for the jury what he believed to be the sequence of wounds that caused Shirley's death: "It's my opinion that she was down on her back, unconscious, dying, as a result of the wounds to her head when the stab wounds were incurred. She was near — certainly near death at that time

because there was very little bleeding into the chest. I feel that she was actually probably dead at the time the slashing wounds were made. I can't be absolutely certain on that, they could all have been postmortem . . . , but she was near death or dead at the time the chest wounds were incurred and the slashing wounds of the throat." The longer knife found in the bedroom could have caused Shirley's stab and slash wounds.

### c. Thomas Potts

Defendant Thomas Potts worked as a part-time handyman and house cleaner. Fred Jenks was one of defendant's clients. Because defendant did not own a car, Fred would usually pick him up for work. Otherwise, defendant would ride his bicycle.

Roughly six months before the murders, Sergeant Darrel Smith "contact[ed]" defendant while defendant was cycling down an alleyway. Smith testified that defendant was carrying a dark duffel bag containing a small axe or hatchet, which had a blunt edge opposite the blade. Defendant claimed to use the hatchet for construction work and left with the tool. The following month, a different officer stopped defendant. Defendant was carrying a gym bag containing pawn receipts, plus "a small hatchet" with a roughly 5-inch blade opposite something "like a hammer." Defendant again left with the tool.

Diana Williams, defendant's friend and former roommate, saw him nearly every day. She confirmed that defendant owned a hatchet with a blade and "a hammer part." Sometime during the month before the murders, defendant moved into a new apartment. Williams saw him use the hatchet in his new home to hammer speaker wire into place.

Diana also described some of defendant's other belongings. When her son Quentin outgrew a pair of Nike shoes, he gave them to defendant. Diana also had been with defendant when he purchased the watch that he wore "every day." She was familiar with it because "the watch pin that would keep the band on" would detach, and she at least twice helped him reinsert the pin.

### d. Events preceding the killings

Defendant received a Social Security payment on the first of every month. Diana Williams was his payee. On August 1, three days before the killings, she received the payment (around $600) and gave it to defendant.

Defendant was a customer at a Hanford liquor store. The store permitted him to maintain a charge account, with payment due every 30 days. Defendant would ordinarily pay the prior month's bill on the first of each month; he paid his May '97 bill on June 1 and his June '97 bill on July 1. On Friday, August 1, however, defendant did not pay his $140 bill for July. According to the store's owner/operator, defendant instead called that day to say that he would be in to pay his tab the following Monday or Tuesday.

Williams returned from an out-of-town trip on Sunday, August 3rd at around 4:00 p.m. Later that evening, at defendant's apartment, she and he watched a movie that he had rented. Williams estimated that they met around 5:00 p.m. and were together for two to three hours.

The next day, August 4th, defendant and Williams went grocery shopping together around 11:00 a.m. Defendant told Williams that "he didn't have any money" because he had gone

to a casino in Lemoore. She did not see him after around 2:00 p.m. As noted, the People and the defense agreed that the Jenkses were likely killed that day after 1:00 p.m.

### e. Events after the killings

The day after the killings, on August 5th, defendant and Williams saw each other for coffee before 9:00 a.m. She returned home from work before noon. Williams believed she saw defendant again that day, though she was not sure when or for how long.

Oscar Galloway testified that he occasionally gave people rides in his car for a few dollars. He took defendant to a casino in Lemoore "a couple of times." Because his memory of the events of early August 1997 had faded, an investigator read from a report he made of an interview with Galloway a few days after the killings. According to the report, Galloway said that on August 5, the day after the killings, he took defendant to a casino and to a destination in downtown Hanford near "the Cottage Bar on Seventh Street."

The evidence adduced at trial suggested that defendant visited a Hanford pawnshop "[o]n Seventh" that day. A pawnshop employee explained that transactions required photo identification and a thumbprint from the person seeking to pawn property. She identified two pawn slips concerning transactions by Thomas Potts at 1:50 p.m. on August 5. A fingerprint analyst testified that the prints on the relevant pawn slips matched defendant's prints. Defendant pawned a ring for $15 and a pendant for $35 — an amount less than his liquor store tab, which he did not pay. At trial, Shirley Jenks's sister testified that the pawned items belonged to Shirley. The

Jenkses' bodies were not discovered until after 7:00 p.m. on August 5th.

Two officers went to defendant's apartment at around 3:00 a.m. on August 6th, the morning after the bodies were discovered, although the record suggests that the officers were not yet aware of the aforementioned pawn transactions. Defendant voluntarily accompanied the officers to a police station, where he was questioned for about 20 or 30 minutes. When asked about his hatchet, defendant said he thought he lost it in his recent move. The officers returned defendant to his apartment and obtained defendant's consent to search. The search revealed a blue duffel bag, but no hatchet, no Nike shoes, and no bloody items.

Diana Williams testified that she and defendant likely met for coffee later that morning, sometime between 8:00 and 9:00 a.m. She went to work and returned home before noon. Defendant came to her apartment. Defendant, Williams, and her son Quentin watched the noon news together; defendant and Quentin in the living room, Williams possibly in the kitchen, about 10 or 12 feet away. News of the Jenkses' deaths came on the television. Although the evidence at trial suggested that the newscast made no mention of a hatchet, Quentin asked defendant two or three times where his hatchet was. Williams testified that she "th[ought] [defendant] avoided . . . the question," though she did not recall precisely how he did so. Quentin testified at trial, however, that defendant said "he [did not] want to discuss that around here because somebody might have bugged the inside of [the] wall." At the preliminary hearing, Quentin claimed that defendant said, "I don't want to talk about it anymore" — despite having not yet discussed it.

8

That evening, defendant and Williams ran an errand together. On the way back, she asked him what time it was. "[H]e said that he didn't have his watch on, and he never goes anywhere without his watch . . . ."

That same day, according to the report of the interview with driver Oscar Galloway, defendant returned to Galloway's residence to retrieve a duffel bag he had left in the back of Galloway's car. The time of day is not clear from the record. According to the report, "Galloway noted that the bag did not look as packed as the day before when Potts got out of his car and left for a while."

Williams believed she saw defendant the following day (Thursday), although she was not sure at what time or for how long. That day, an officer went to the aforementioned pawn shop "to pick up the police department copies of all pawn slips since the first part of August." He gave the slips with the name Thomas Jerry Potts on them to an investigator, who then retrieved the pawned jewelry.

Police arrested defendant the day after obtaining the jewelry. He was wearing eyeglasses at the time. Detective Walker removed the glasses from defendant's face and examined them for possible trace evidence. Walker saw "what appeared to be either a rust spot or a droplet of blood." Later DNA testing revealed that a combination of Fred Jenks's and defendant's genetic material accounted for the DNA on the glasses. An expert explained that it would be "[n]ot at all" surprising to find defendant's DNA on his own glasses. Assuming that defendant's DNA was on his glasses, the expert continued, the odds of another person completing the DNA profile on the glasses and contributing nothing more were 1 in

1.78 million Caucasians; 1 in 2.26 million African Americans; or 1 in 1.82 million Hispanics. Fred Jenks's death certificate described him as Caucasian.

The day of defendant's arrest, Detective Walker spoke with Diana Williams. She described defendant's watch before Walker showed her the watch found at the crime scene. When Walker then showed her the watch, she identified it as defendant's.

Near the end of that month, Williams cleaned out defendant's apartment, essentially moving him out. She did not find Nike shoes, the hatchet, a "fairly new" "pair of jeans . . . he used to wear all the time," a "fairly new" Wilson shirt, or his watch.

### f. Grand theft (count 4)

Before the Jenkses were killed, defendant cleaned the home of Viola Bettencourt and her companion Frank. Bettencourt wore a ring one day and placed it in a container on her dresser when she returned home. Defendant came to clean the next day. The day after he cleaned, Bettencourt noticed that the ring was missing. When defendant returned to clean the following week, she accused him of taking the ring. Defendant denied the allegation, saying, "[n]o, I don't do things like that." He did not hit, threaten, or do anything that frightened her. Defendant cleaned for another hour or two, but Bettencourt did not hire him after that.

A pawn slip suggested that on June 26, 1997 — the same day of the week that Bettencourt believed defendant took her ring — defendant pawned a ring at about 3:00 pm. The description of the property pawned was consistent with a ring

that Bettencourt identified as her own. Defendant apparently received $100 for the ring; paid $114.50 on July 1, 1997, to get the ring back; and pawned it again at a different shop that same day for $125. Police retrieved the ring, which Bettencourt identified as her own. Bettencourt's ring appraised for $1,250 in 1967 and reappraised for $3,500 in August 1997.

### 2. *Defense case*

The thrust of the defense was that defendant did not kill the Jenkses. Cross-examination focused on alleged gaps or inconsistencies in the prosecution's evidence, including testimony regarding the characteristics of defendant's hatchet; whether the blood on defendant's glasses was analyzed correctly; and the lack of evidence that defendant tracked home blood or had otherwise been at the crime scene. For example, defense counsel elicited testimony that a fingerprint analyst had lifted an estimated 15 to 20 usable prints from the crime scene and was able to eliminate defendant as having left any of those prints.

The only witnesses called by the defense had already testified during the prosecution's case-in-chief. Two witnesses discussed how an intensive search of defendant's apartment after his arrest failed to yield evidence that he was involved in the Jenkses' killings. Another conceded that no blood was found on defendant's bicycle. Diana Williams clarified when and where she saw defendant during the relevant period. And Quentin admitted that the comment he claimed to hear defendant make while watching the news should have been heard by his mother, who had denied hearing it. No evidence was presented regarding defendant's whereabouts after he left Williams's company on the day of the killings.

11

## B. Penalty Phase

### 1. Prosecution case

At the penalty phase, the People presented evidence that defendant had sexually assaulted three women, including Shirley Jenks. The People also elicited victim impact testimony and introduced documents revealing that defendant had suffered several prior convictions.

### a. Sexual assaults

Carol T. testified that in 1979, when she was 16 years old, she moved to California with her boyfriend and began searching for a job. When she was waiting at a bus stop, defendant offered her a ride in the car he was driving. He took her to pick up job applications. By late afternoon, Carol had asked him several times to take her home. Defendant did not do so; eventually, he instead took her to his apartment, which she did not wish to enter. When they arrived inside, defendant shut the door and put a straight razor to Carol's throat. He then raped her and attempted forcible anal penetration. Carol eventually escaped from the apartment by jumping out a second-story bathroom window. Cross-examination focused on the fact that defendant had been drinking, and possibly smoking marijuana, before the assault.

Diane H. was acquainted with defendant through his then-wife Lori, who sometimes babysat on Diane's behalf. One evening in February 1980, at around 9:00 or 10:00 p.m., defendant came to Diane's house alone, intoxicated, and uninvited. Diane was home with her two young children, but her husband was incarcerated at the time. She let defendant in and offered him coffee to help sober him up, "so he could go

home" without "get[ting] a drunk driving." After he was let in, defendant brought Diane to the ground and choked her. He then forced her to have intercourse with him, stopping only when her two-year-old child woke up and came into the living room. After the child returned to bed, defendant raped Diane approximately twice more. Cross-examination focused solely on the fact that defendant was drunk at the time.

Sexual Assault Response Team (SART) nurse Georgeanne Green examined Shirley's corpse for evidence of sexual assault. Green observed suspicious injuries that were consistent with forced penetration. Additionally, Forensic Pathologist Thomas Bennett reviewed Dr. Dollinger's autopsy report, a SART case summary, and photographs Green took during her examination. He concluded that although no semen was recovered from Shirley's body, there was "clearly . . . evidence of forced sexual penetration of Shirley Jenks." Her injuries, he testified, could have been inflicted as early as two hours prior to her death, or as late as a few minutes after her death. If she were conscious during the assault, she would have felt pain.

Bennett was not sure what "instrument" caused Shirley's injuries. "Could it be a finger? Yes. Could it be a broom handle? Yes. Could it be a penis? Yes. It's not specific." Cross-examination elicited that Bennett did not find evidence of any nontissue blunt object (such as a broom, as opposed to a body part). Bennett further acknowledged that it was possible to examine a man to determine whether he had engaged in forcible sexual activity, and that such examination was done in this case. The People presented no evidence suggesting that the examination yielded inculpatory information. During closing argument, however, the prosecutor observed that a videotape of the crime scene showed Shirley's body at the edge of the bed,

13

legs spread, without underwear, "and her nightgown is pulled up, over up across her waist, exposing her private area."

### b. *Victim impact*

Clarence Washington was the Jenkses' son-in-law, through marriage to their daughter Debra. He had introduced defendant (his cousin) to the Jenkses, who had high praise for defendant's work and "really liked him a lot."

Clarence and the Jenkses were close. He had previously lived with them for about a year, vacationed with them every year for the eight years preceding their deaths, spoke with them approximately every other day, and sometimes referred to them as Mom and Dad. Fred Jenks was a father figure to Clarence, whose own father had succumbed to cancer around 1992. At the time of trial, Clarence was taking antidepressant medication and had "been in intensive outpatient therapy."

Clarence also testified that Debra was quite close to her parents. She and Shirley Jenks, Clarence explained, were "more of sisters, best friends, than mother and daughter"; they were "extremely close" and spoke perhaps two or three times per day. Debra and Clarence learned of the Jenkses' deaths as the result of a TV report. A friend of Debra saw a news story about a couple who had been killed, which showed parts of the Jenkses' home and a car belonging to Fred. The friend called Debra, who was (and, earlier that day, had been) unable to reach her parents by phone. According to Clarence, Debra went "ballistic." He took her to a psychiatric care facility the next morning. She stayed in that facility for 22 days, was "released for a short period," entered another psychiatric facility, was again released, entered another psychiatric facility, "and then right now she's heavily medicated." Debra, Clarence testified, is now "almost

an invalid. I have to care for her just about 24 hours a day." "She has no will to live, and at times she has urinated and defecated on herself." "She's said she's not suicidal, but some of her actions warn me to think that she is."

Billie Lou Hazelum, Shirley Jenks's sister, also testified. Hazelum explained that Fred and Shirley had a "[v]ery good" relationship; they were "[l]ike love birds." She and Shirley, too, had a "[w]onderful," close friendship. When they were together, they would "go shopping, talk about old times[,] [d]ance in the morning when we'd get up to music." She thought about Shirley and Fred constantly. She even had to replace her cutlery, which reminded her of one of the knives used in the murders.

Hazelum had also had a close relationship with the Jenkses' daughter Debra. She thought of Debra as one of her own daughters and as a good friend. Since the murders, however, Debra had been unwilling to see Hazelum, because Hazelum resembled Shirley.

### c. Prior convictions

The People introduced certified documents indicating that defendant had been convicted of perjury, auto theft, statutory rape (regarding Carol T.), and twice convicted of robbery.

Aside from the statutory rape conviction, defendant had not been convicted of sexually assaulting either Carol T. or Diane H. Carol T. left California before she was due to appear in court. Diane H. did not report her assault to the police. Among other things, she was afraid that if her husband became aware of the assault, he would kill defendant, "[a]nd then [her] babies would have been without a dad."

### 2. *Defense case*

Defense counsel called only two witnesses during the penalty phase. Psychiatrist Norberto Tuason, M.D., assessed defendant about four months before the killings. Defendant complained of paranoia, and that he was hearing voices "again." Dr. Tuason concluded that defendant "suffered from chronic paranoid schizophrenia," with which defendant had been previously diagnosed. Dr. Tuason was also concerned that defendant abused alcohol. Concluding that defendant was treatable and did not require hospitalization, Dr. Tuason prescribed medication and recommended that defendant follow up with him in two months. At the follow-up meeting about two months before the killings, defendant told Dr. Tuason, " 'The voices went away.' " Dr. Tuason further explained, however, that it is often difficult to ensure that paranoid schizophrenics stay on their medication, and he made clear that "symptoms can recur within a day or two once the medication has been missed."

Among other things, cross-examination explored whether alcohol use might explain defendant's symptoms. Dr. Tuason admitted that, although his diagnosis was unchanged, excessive alcohol use alone could explain defendant's symptoms even if defendant did not suffer from schizophrenia. When asked on recross-examination, "[H]ow do you know it's not alcohol abuse instead of schizophrenia?," Tuason responded, "I don't know. You would not know." Cross-examination also revealed that defendant was aware and logical during his interview with Dr. Tuason and that defendant was capable of knowing right from wrong. Moreover, although Dr. Tuason concluded that defendant had "subnormal intelligence," his conclusion was based solely on defendant's description of his academic

performance, rather than an IQ test or a review of academic records.

Dr. Tuason told the jury that defendant had been examined by a social worker on August 10, 1997, several days after the murders. The social worker indicated that defendant was " 'currently medically noncompliant,' " which, Tuason explained, means in the field that defendant was not taking medication as recommended. That notwithstanding, defendant reportedly " 'denie[d] any hallucinations, suicidal ideations or homicidal thoughts' "; was " '[n]ot exhibiting any psychotic behaviors' "; and did not " 'present an immediate danger to self or others.' "

Defendant's mother Lula also testified. Lula and defendant's father separated when defendant was about two years old. Defendant "loved his father and he couldn't understand why his father wasn't there."

Lula moved the family to Los Angeles when defendant was about two-and-a-half years old. She raised him as a single mother until he was about 14 years old, after which she remarried. Defendant was a "good boy" until he was about 16, when he began getting in trouble, "joyriding in cars and things like that." She and defendant's stepfather then brought him back to Hanford (where he had been born), apparently at defendant's request. According to Lula, defendant believed he would be able to stay out of trouble in a small town. He also "loved his cousins" in the Hanford area and "wanted to be around them."

Lula asked the jury to spare her son's life. Even after he found trouble, she testified, she knew him to be "a quiet, easygoing person" who "loved his family a lot." He loved and

tried to protect his mother and sister. He came to know and love his stepfather. He was kind, loving, and compassionate with his own son. "My son didn't kill those people," she testified, "[h]e's not that kind of a person." Defendant, she added, was "brought up God fearing," and during his incarceration, "[h]e's reading the bible, he's praying."

## II. Discussion

### A. Sufficiency of the Evidence

Defendant concedes that the evidence adduced at trial provides "an arguably satisfactory" answer to the question of who killed the Jenkses. Indeed. The evidence inculpating defendant as the killer included the blood on his glasses; the jewelry he pawned before the Jenkses' bodies were discovered; the lack of indicia of forced entry; his missing watch, found under Fred Jenks's corpse; the hatchet supposedly lost in his move, yet seen in his new apartment; and his refusal to answer Quentin's questions about where the hatchet could be found. That said, a conclusion that defendant killed the Jenkses does not itself imply that he is guilty of murder in the first degree. Instead, defendant is guilty of two counts of first degree murder only if each killing (1) was premeditated and deliberate or (2) occurred during the commission or attempted commission of robbery. (See § 189 [first degree murder]; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 847-849 (*Daveggio*).)

Defendant contends that the evidence was insufficient to support either theory. We disagree. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the killings were deliberate and premeditated, and that they occurred during the commission of a robbery. (*Jackson*

18

*v. Virginia* (1979) 443 U.S. 307, 319; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1212 [discussing standard of review]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [same].)

### *1. Premeditation and deliberation*

"A murder that is premediated and deliberate is murder of the first degree." (*People v. Jurado* (2006) 38 Cal.4th 72, 118 (*Jurado*).) " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*Ibid.*) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*Ibid.*; see also *People v. Anderson* (1968) 70 Cal.2d 15, 24-34 (*Anderson*).) "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People v. Thomas* (1945) 25 Cal.2d 880, 900.) Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things. (See *Anderson*, at pp. 26-27; *People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*); *People v. Brooks* (2017) 3 Cal.5th 1, 59; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081 (*Koontz*); *People v. Thomas* (1992) 2 Cal.4th 489, 517.)

The evidence that defendant arrived at the Jenkses' home carrying a weapon suggests that the murders were planned. (See *People v. Salazar* (2016) 63 Cal.4th 214, 245; *People v. Wharton* (1991) 53 Cal.3d 522, 547; *Perez, supra*, 2 Cal.4th at p. 1128.) Although police had stopped defendant at least twice

while he had his hatchet, Diana Williams's testimony suggested that defendant did not carry it routinely.

Defendant also had a motive to kill the Jenkses: to facilitate the taking of Shirley Jenks's jewelry. (Cf. *Perez*, *supra*, 2 Cal.4th, at p. 1128 ["the conduct of defendant *after* the stabbing, such as the search of dresser drawers [and] jewelry boxes . . . would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing"].) Defendant had previously taken jewelry from Bettencourt, who accused him of doing so. He had opportunity to know, from cleaning for the Jenkses, that Shirley owned significant amounts of jewelry — and apparently knew enough to "ransack[]" a room containing significant amounts of jewelry while leaving another room "basically immaculate." A rational trier of fact could conclude that defendant killed the Jenkses so that he could take their jewelry without risk that they would identify him as the culprit. (Cf. *Perez*, at p. 1126 ["it is reasonable to infer that defendant determined it was necessary to kill Victoria to prevent her from identifying him"].)[2]

The manner of the killings also supports a finding of premeditation and deliberation. The attack — involving multiple weapons, numerous stabs and slashes, and, apparently, a knife-sharpening interlude — was undoubtedly "prolonged." (*People v. Sandoval* (2015) 62 Cal.4th 394, 425; cf. *People v. Streeter* (2012) 54 Cal.4th 205, 244 [manner of killing suggested premeditation and deliberation where "defendant's

---

[2]     Evidence bearing on whether the intent to steal was formed before the killings is addressed *post*, in part II.A.2. The evidence of premeditation and deliberation would be sufficient even if this motive were ignored.

acts occurred in stages"].)  In particular, the attacks with the knives suggest deliberation, not only because they came later, but also because "plunging a lethal weapon into the chest evidences a deliberate intention to kill." (*Anderson, supra,* 70 Cal.2d at p. 27.)  Further, a jury could quite reasonably infer that a person who followed a horrific double homicide by opening a package of cookies was not surprised and dismayed by what he had done, as one who acted impulsively might be.  The evidence of premeditation and deliberation was particularly strong with respect to Shirley's murder, because defendant had to travel through the house to reach her after attacking Fred near the front door.  (Cf. *People v. Cage* (2015) 62 Cal.4th 256, 277 [manner of killing suggested premeditation and deliberation when, "instead of then leaving the home, defendant stepped over or around Bruni's bloody body and proceeded up the stairs to David's room"].)

On appeal, defendant encourages us to speculate about what might have happened inside the Jenkses' home, in service of an argument that the jury could not have ruled out his speculative hypotheticals beyond a reasonable doubt.  We are not persuaded.  Defendant's appellate briefing suggests, for example, that he may have gone to the Jenkses' house to work and killed in a spontaneous fit of rage.  But the Jenkses were found dressed in night clothes, not as though they were expecting company.  Further, Diana Williams testified that defendant ordinarily told her when he would be working, which he did not do in the week or so before the killings:  "Q.  In the week or so before [the day the bodies were discovered], did [defendant] mention anything about going to work for the Jenks? [¶]  A.  No.  [¶]  Q.  Did he normally tell you when he was going to be working?  [¶]  A.  Yes.  [¶]  Q.  And he didn't tell

you? [¶] A. No." In this context, the fact that officers found a few bloody dollars on Fred Jenks's body would not have required rational jurors to conclude that the murders were the spontaneous result of a job gone bad, rather than premeditated.

Moreover, this theory calls for further speculation that (i) defendant had a legitimate reason for arriving with a hatchet (which would seem unnecessary for mere housekeeping work); that (ii) defendant was somehow and for some reason enraged; and that (iii) the Jenkses died before defendant formed a deliberate and premeditated intent to kill them. As to this last premise, even if the Jenkses were dead by the time of the knife attacks, postmortem conduct can still be probative of a defendant's state of mind before the fatal wounds were inflicted. (See, e.g., *People v. Manibusan* (2013) 58 Cal.4th 40, 89; cf. *Perez*, *supra*, 2 Cal.4th at p. 1127 ["[D]efendant would not have known the precise moment of death or which wound would cause it. Moreover, the jury could reasonably infer that the postmortem wounds were inflicted to make certain the victim was dead."].) A theory that a person killed in a fit of rage is undermined by proof that, after ample opportunity for reflection, the person decided that continuing a violent attack was appropriate.

Defendant's appellate briefing also suggests that perhaps he went to the Jenkses' home to solicit a cash advance. But the evidence indicated that he and Fred Jenks had communicated via telephone in the past, making an unannounced drop-in seem unnecessary. Nor is it clear why defendant would need to bring his hatchet to request an advance innocently. And here, too, there is a wide gulf between (1) a theory that defendant showed up for an innocuous reason and (2) the violent killings revealed by the evidence. (Cf. *People v. Zamudio* (2008) 43 Cal.4th 327,

361, fn. 18 (*Zamudio*) ["It seems extremely unlikely that a truly peaceful person who has no history of violence and is on very friendly terms with his victims would fly into a homicidal rage simply because his victims decline his request for a second loan and criticize his spending choices"].) We of course agree with defendant that the prosecution bore the burden of proof beyond a reasonable doubt. But a reasonable jury could find that burden satisfied notwithstanding his string of suppositions. The evidence, in short, was sufficient to support findings of premeditated and deliberate murders.

### 2. *Robbery*

Defendant further contends that the evidence was insufficient to support a conclusion that the killings occurred during the commission of a robbery. (See § 189 ["All murder that is . . . committed in the perpetration of . . . robbery . . . is murder of the first degree"].) "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "[A] conviction of robbery cannot be sustained in the absence of evidence that the defendant conceived his intent to steal either before committing the act of force against the victim, or during the commission of that act; if the intent arose only after the use of force against the victim, the taking will at most constitute a theft." (*People v. Morris* (1988) 46 Cal.3d 1, 19; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 28 [discussing robbery-murder special circumstance].) Defendant argues that no rational jury could rule out the possibility, beyond a reasonable doubt, that defendant formed his intent to take the Jenkses' property only after the acts of force had concluded. We again disagree.

" ' "[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 346 (*Jackson*); see also *People v. Johnson* (2015) 60 Cal.4th 966, 988 ["The jury could readily conclude defendant intended to steal when he entered the victim's house with a weapon and beat her to death. It did not have to conclude he killed the victim for no apparent reason and only then decided to steal."].) Here, the evidence indicated that defendant took a substantial amount of jewelry from the Jenkses' home, some of which he pawned even before the bodies were discovered. Moreover, although the Bettencourt theft did not involve force, the incident lends support to a determination that defendant intended to take jewelry from the Jenkses' home before he inflicted the fatal blows. (See *Jackson*, at p. 346 ["The jury can also infer a defendant's intent to steal from his commission of other similar crimes"].)

Notably, even defense counsel's hypothetical reasons why defendant may have been at the Jenkses' home center on an attempt to acquire funds, whether through work or by requesting an advance. Even if defendant had been provoked into a rage — because no paying work was available, or because no cash advance would be made — the evidence would support a conclusion that the killings occurred during the commission of a robbery if defendant formed the intent to take the jewelry while killing the Jenkses. A rational jury applying the beyond-a-reasonable-doubt standard could rule out a hypothetical scenario in which defendant dropped in for an unannounced social visit (with a hatchet, at a time when the Jenkses were in their night clothes); became sufficiently enraged to brutally

murder the people he was visiting; and then decided, as an afterthought, to take the jewelry.

To conclude that the evidence of a preexisting intent to steal was sufficient to prove the crime of robbery, it is not necessary to rely on the evidence that defendant lacked money to go grocery shopping and had recently pledged to pay his liquor-store debt. But these circumstances further confirm that the evidence of robbery was sufficient. Recall that three days before the killings, defendant called a liquor store to say that he would pay his debt on Monday, August 4 (the day the Jenkses were killed) or Tuesday, August 5 (the day he pawned some of Shirley Jenks's jewelry). As noted, Diana Williams's testimony indicated that as of August 4, defendant "didn't have any money to go grocery shopping." These facts support an inference that defendant (whose schedule appeared to be flexible) did not merely lack time to pay the liquor store on or right after August 1, but instead, that he lacked the resources. More importantly, these facts suggest that defendant expected to *acquire* resources sufficient to cover his $140 tab — by the day of, or after, the Jenkses were killed. A rational trier of fact could understand this evidence to point toward a preconceived plan to rob.

Defendant urges us to ignore these details in our analysis of the sufficiency of the evidence, asserting that "poverty is such poor evidence of a motive for theft, much less robbery and murder, that it is not even admissible on that issue." This argument misses the mark twice over. First, it is true that "a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice." (*Koontz, supra*, 27 Cal.4th at p. 1076; see also, e.g., *People v. Clark* (2011) 52 Cal.4th 856,

928-930.) But the evidence here *was* admitted, and its probative value bears on the sufficiency of the evidence at trial, regardless of the risk of prejudice that came with it. (Cf. *Lockhart v. Nelson* (1988) 488 U.S. 33, 40 [reversing a conviction because evidence was improperly admitted at trial is not equivalent to reversing for insufficient evidence, even if, without that evidence, the proof adduced at trial would have been insufficient].) Our case law has taken similar evidence of a defendant's particularized need or desire for resources into account. (See, e.g., *Jackson, supra,* 1 Cal.5th at p. 346 ["the jury could infer . . . that Jackson's need for cash motivated him to break into Myers's house"]; *Zamudio, supra,* 43 Cal.4th at p. 360 ["there was ample evidence here that defendant killed the Bensons and took their property because he needed or wanted money"]; *People v. Sakarias* (2000) 22 Cal.4th 596, 619.)[3]

Second, this evidence did not merely show that defendant was impoverished. Instead, it revealed a baseline of his finances — whatever their state — and showed that he expected to acquire enough money to cover a debt that exceeded his current ability to pay. It is the expected acquisition of funds in the near future that makes these circumstances probative, not the mere fact of poverty. (Cf. *People v. Kelly* (1901) 132 Cal. 430, 431-432 ["Generally, evidence of the wealth or poverty of a defendant is not admissible; but the sudden possession of money, immediately after the commission of a larceny, by one who

---

[3] Although defendant's opening brief raises 18 separately numbered issues on appeal, a challenge to the court's discretionary admission of this evidence is not among them — perhaps because defendant appears to acknowledge that no objection was made below.

before that had been impecunious, is clearly admissible as a circumstance in the case"].)

To be sure, defendant's call to the liquor store did not necessarily imply that he planned to take the Jenkses' property. The call was made before he told Diana Williams that he had lost his money at the casino, and it is possible that he lost his money after the call but before speaking with Williams. It also appears that defendant did not pay the debt, perhaps because the jewelry he pawned yielded less than the amount he owed. Regardless, details surrounding the call — defendant's deviation from the norm of paying on the first of the month, yet apparent expectation of having money a few days later — provide additional circumstantial evidence in support of the jury's verdict.

## B. Reasonable Doubt Instruction

Defendant raises several arguments concerning the definition of "reasonable doubt" provided to the jury. He claims that a pattern instruction inadequately defined that concept. He further contends that the instruction was undermined both by asserted prosecutorial misconduct and by the trial court's comments during jury selection. Even assuming defendant's claims are preserved for our review, we perceive no reversible error.

### 1. CALJIC No. 2.90

"The federal Constitution's due process guarantee 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' [Citation.] The Constitution 'does not require that any particular form of words

be used in advising the jury of the government's burden of proof,' but it does require that, ' "taken as a whole, the instructions . . . correctly conve[y] the concept of reasonable doubt to the jury." ' [Citation.] What matters, for federal constitutional purposes, is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*Daveggio*, *supra*, 4 Cal.5th at pp. 839-840.)

The jury was instructed with CALJIC No. 2.90. The court advised: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." We have "repeatedly upheld" this instruction "against constitutional challenge." (*Daveggio*, *supra*, 4 Cal.5th at p. 840; see also, e.g., *People v. Lucas* (2014) 60 Cal.4th 153, 294-299 (*Lucas*).)

Defendant complains that the instruction "merely tells the jurors that they need to expect to remain convinced of the truth of the charge for a prolonged period ('abiding conviction'), without telling them *how* convinced they must be." We perceive no error. "An instruction cast in terms of an abiding conviction as to guilt . . . correctly states the government's burden of proof." (*Victor v. Nebraska* (1994) 511 U.S. 1, 14-15 (*Victor*); see also *People v. Romero* (2015) 62 Cal.4th 1, 42; *People v. Brown* (2004)

33 Cal.4th 382, 392; *Lisenbee v. Henry* (9th Cir. 1999) 166 F.3d 997, 999-1000.)  Defendant advances no persuasive reason to depart from this well-settled rule, notwithstanding his complaint regarding a prosecutor's discussion of the instruction. (See *ante*, at part II.B.2.)

Defendant also complains of the instruction's statement that a defendant "is presumed to be innocent *until* the contrary is proved, and in the case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty." (Italics added.)  Defendant argues that the term "until" implies that the People will inevitably satisfy their burden.  We disagree.  The word "until" can refer to a condition that may never be satisfied.  No reasonable juror would have understood the instruction to suggest that the People would inevitably satisfy their burden of proof, because "the instruction . . . expressly dictates what should occur in the event the jury finds a reasonable doubt." (*Lucas*, *supra*, 60 Cal.4th at p. 296.)

### 2.  Asserted prosecutorial misconduct

The case against defendant was tried by two prosecutors, Michael Reinhart and Gayle Helart.  Defendant contends that Helart committed misconduct during the rebuttal portion of closing argument, lowering the People's burden of proof.  There was no error.

### a.  Background

Because defendant's challenge to Helart's rebuttal argument draws on the context in which that argument was made, we begin by describing the arguments that preceded hers.

Deputy District Attorney Reinhart delivered the initial portion of the People's closing argument.  In pertinent part, he

argued: "Lastly, on the idea of these instructions and the law, I know they may have sounded like the instructions on how to do — how to program your VCR or stereo. They get rather complicated and convoluted. But at the core of them, they're really based on common sense. And if you're back there and you find yourself going against your common sense, you say something like, well, we know he's guilty, but the instructions say this, so does that mean that we have to find him not guilty? If you find yourself going against your common sense, going off on places where you really don't think common sense tells you you should be going, stop. Come back, ask the judge to clarify them. Don't go down too far a road because you may be misreading or reading too much into the instructions. They really are based on common sense, and, again, if you're violating your common sense, you're going against something you just think, hey, this don't sound right, ask the Judge. That's very common to do. Be sure you understand the instructions."

After Reinhart concluded, defendant's trial counsel delivered closing argument. In pertinent part, counsel contrasted proof by a preponderance of the evidence, proof by clear and convincing evidence, and proof beyond a reasonable doubt. He continued, "If you go back into that jury room and you tell yourself and your colleagues agree, you know, I'm pretty sure he did it, you have to enter verdicts of not guilty because the law says you've got to be more than pretty sure."

Deputy District Attorney Helart responded as follows: "Defense tried to do this, I don't know, hierarchy of reasonable doubt, and boy, when the defense does the hierarchy it just sounds like preponderance is way down here, and clear and convincing is kind of here, and beyond a reasonable doubt is clear up here, high as Mt. Everest. That's sort of what the

inference is, kind of like a bar chart or something. Well, you know, we could do a bar chart the other way, and let's start with beyond a reasonable doubt right down here, and then you could go beyond a shadow of a doubt right there, and beyond any doubt right here, and absolutely certain up here, and then way up here is one hundred percent certain. So you see that's not really very helpful. You can kind of manipulate bar charts any way you want to and that's not helpful. [¶] *But in your consideration of reasonable doubt don't ever come back and tell a prosecutor, 'Gosh, you know, we believed he was guilty, but —.' Don't do that. If you believe he's guilty today and you'll believe he's guilty next week then that's that abiding conviction that's going to stay with you.* And 'beyond a reasonable doubt' is defined in the jury instructions it's not a mere possible doubt; anything open to being human has some possible or imaginary doubts. It's what's reasonable." (Italics added to the language challenged on appeal.)

### b. Analysis

Defendant argues that the portion of Helart's rebuttal emphasized above diminished the reasonable doubt standard. The claim is not preserved for our review. "A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made 'a timely and specific objection at trial' and requested an admonition." (*Daveggio*, 4 Cal.5th at p. 853; see also, e.g., *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*); *People v. Green* (1980) 27 Cal.3d 1, 27-35.) Defendant neither objected nor requested an admonition. These failures could be excused if an objection would have been futile or a request for admonition ineffectual. (See, e.g., *Daveggio*, at p. 853.) But we have no reason to doubt that the trial court would have sustained any meritorious objection, nor to doubt

that any prejudice could have been cured by an admonition emphasizing that the jury should follow the court's instructions and disregard the statements at issue.

Defendant contends that he "is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights." (*People v. Vera* (1997) 15 Cal.4th 269, 276.) But he identifies no authority indicating that such a right is at issue here, and we have repeatedly applied our ordinary forfeiture rule to claims that a prosecutor misstated the reasonable doubt standard. (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1156; *People v. Anderson* (1990) 52 Cal.3d 453, 472; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1214-1215.)

Defendant likewise fails to identify any authority indicating that forfeiture concerns are irrelevant because his claims concern " 'a pure question of law which is presented by undisputed facts.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1061.) Defendant's interpretation of that exception to the forfeiture rule would seem to imply that any issue reviewable de novo may be raised for the first time on appeal, even when, as here, information about the prosecutor's intonation would be relevant, but is not revealed by the trial transcripts. Such an exception would allow a defendant to invalidate an entire trial based on a claim of prosecutorial misconduct that could have been easily remedied by a timely objection and an admonition. We decline to extend the exception to the circumstances presented here, or to excuse the forfeiture as a matter of discretion.

Even assuming that there was no forfeiture (or that we should reach the merits regardless, as a matter of discretion),

there was no error. A claim of prosecutorial misconduct may have merit even absent proof that a prosecutor had "a culpable state of mind." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) For this reason, "[a] more apt description of the transgression is prosecutorial error." (*Ibid.*) Such error occurs when a prosecutor misstates the law by, for example, making remarks that would "absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*People v. Marshall* (1996) 13 Cal.4th 799, 831; accord *People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*).) For such remarks to constitute error, however, it is not enough that the remarks could be construed as improper. (*People v. Winbush* (2017) 2 Cal.5th 402, 480.) Instead, "[a] defendant asserting prosecutorial misconduct must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568; see *Cortez*, at pp. 130-134; see, e.g., *Centeno*, *supra*, 60 Cal.4th at p. 665 [finding such a likelihood when "the prosecutor used a visual display" — an outline of California — "to illustrate the standard of proof"].)

In context, it is not reasonably likely that jurors understood Helart's remarks in an objectionable fashion. A reasonable juror would interpret the argument as a whole as carrying the general import that an abiding conviction is one so strongly held that it lasts, rather than one that is fleeting and might weaken in the near future. As context reveals, the argument was framed in response to the defense's "hierarchy of reasonable doubt"; jurors, Helart argued, should not be misled into acquitting based on that hierarchy (" 'Gosh, you know, we believed he was guilty, but — ' "), but should instead rely on the

actual meaning of " 'beyond a reasonable doubt,' " a phrase "defined in the jury instructions."

Our recent decision in *Cortez* supports this conclusion. The prosecutor in that case stated: " 'The court told you that beyond a reasonable doubt is not proof beyond all doubt or imaginary doubt. Basically, I submit to you *what it means is* you look at the evidence and you say, "I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me." ' " (*Cortez*, *supra*, 63 Cal.4th, at p. 130, italics added.) After an objection, the prosecutor added, " '[t]hat's proof beyond a reasonable doubt.' " (*Ibid.*)

Faced with a claim of misconduct, we "observe[d] that the challenged remarks, viewed in isolation, were incomplete at best. They informed jurors that their 'belief' about what had happened had to be 'based in the evidence' rather than 'imaginary.' " (*Cortez*, *supra*, 63 Cal.4th at p. 131.) "Although this is a correct statement of the law," we continued, "it does not alone suffice as a definition of the beyond-a-reasonable-doubt standard." (*Ibid.*) Viewing the argument and instructions as a whole, however, we found no misconduct. (*Id.*, at pp. 133-134.) We explained, "given that the challenged comments were brief and constituted a tiny, isolated part of the prosecution's argument, that the prosecution was responding to defense counsel comments, that the prosecution expressly referred the jurors to the instruction they had on reasonable doubt, that both the court and defense counsel properly defined 'reasonable doubt' numerous times, and that the jury had written instructions during deliberations that properly defined the standard, we find no reasonable likelihood the jury construed or applied the prosecution's challenged remarks in an objectionable fashion." (*Ibid.*)

There was likewise no error here. True, this case is not precisely the same as *Cortez*; for example, defense counsel did not object to Helart's remarks. But those remarks were brief, they were made in response to defense counsel's comments, and they referred jurors to the court's instructions. Moreover, the court instructed jurors, both immediately after they were sworn and before the start of closing arguments, that "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." (Cf. *Cortez, supra*, 63 Cal.4th at p. 131.) To guide their deliberations, jurors were also provided with a copy of this instruction and with CALJIC No. 2.90. (Cf. *ibid.*) We presume not only that jurors follow instructions in general (*Daveggio, supra*, 4 Cal.5th at p. 821), but also "that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade" (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8; accord *Cortez*, at p. 131). We have no reason to deviate from those presumptions here, and note that, despite Prosecutor Reinhart's invitation, the jury did not request clarification of the reasonable doubt instruction. Under these circumstances, it is not reasonably likely the jury construed the remarks in an objectionable fashion, nor that "the jury understood the instructions to allow conviction based on" inadequate proof. (*Victor, supra*, 511 U.S. at p. 6.)[4]

---

[4]    Defendant further claims that the "don't ever come back and tell a prosecutor" statement suggested "that jurors would be accountable to the prosecution after they reached their verdict." This claim is also not preserved for our review. In any event, it is not reasonably likely that jurors understood the comment in

### 3. *Trial court's comments during jury selection*

During jury selection, the trial court gave prospective jurors an example of when someone might draw a conclusion based on circumstantial evidence. Defendant contends that, in doing so, the trial court diluted the reasonable doubt standard.

### a. *Background*

Before prospective jurors received questionnaires, the trial court used CALJIC No. 2.90 to instruct them about the presumption of innocence and the burden of proof beyond a reasonable doubt. After the questionnaires were completed, a prosecutor asked whether the attorneys would be permitted to question prospective jurors "during general voir dire." When the trial court indicated that it "had not intended to permit that," the prosecutor asked the court to add "two questions . . . to its list." The first question concerned whether jurors would be biased in favor of the defense because more people would be sitting at the prosecution's table at trial. Defense counsel objected, and the court refused to ask the question.

The prosecutor's second request concerned the burden of proof. The prosecutor explained to the court: "[I]t appears that a number of these jurors, notwithstanding the Court having already instructed that the burden of proof is beyond a

─────────────────

the way defendant claims. Helart clearly did not want the jury to acquit based on a less-than-reasonable doubt, and communicated her view that doing so would be a mistake. But her brief, isolated comment could not reasonably be understood to threaten adverse consequences for jurors.

Finally, because the prosecutor's remarks were not erroneous, trial counsel was not ineffective for declining to object to them.

reasonable doubt for the guilt phase, have expressed opinions that because it's a death penalty case it would require guilt beyond a shadow of a doubt, at least expressed by one, one said like a hundred percent. There is at least enough of them to raise a concern by us that they would not follow the law." The court responded, in pertinent part, "I do intend to include a discussion of circumstantial evidence and I intend to remind the jurors or to inform the jurors that a consideration of circumstantial evidence is no different in a death penalty case than it is in any other trial. . . . [I]f a juror either indicates here or has indicated in their written declarations that they're going to have a problem utilizing those conventional criteria for evaluating circumstantial evidence and following the Court's instructions on burden of proof, then I'll — we'll individually examine them." Defense counsel did not object, nor probe the connection between the prosecutor's requested question (regarding the burden of proof) and the court's anticipated question (regarding circumstantial evidence).

Four panels of prospective jurors were called to the courtroom. The court illustrated for each panel the concept of circumstantial evidence. Before doing so, the court explained the purpose of the illustration, with statements like, "One of the types of evidence that people sometimes are a little confused about is the evidence that we call circumstantial evidence. . . . There's nothing mystical about circumstantial evidence, and the best way to approach this would be just to give you a simple example."

The example that most strongly supports defendant's claim of error went as follows: "Let's assume that you or your spouse prepared . . . a raspberry pie and you set that on the counter to cool. There's nobody home except you and your nine-

year-old child, and you tell the child to stay away from that pie, that you have company coming that evening and you don't want the pie to be messed up, keep their fingers out of it. And then you leave and you go about your tasks. Nobody else comes or goes from the house. An[] hour or two later you come back into the kitchen and somebody has stuck their finger in that pie, and you go look for the child, and sure enough, there's your nine-year-old in the bedroom and he or she has raspberry pie filling on their lower lip. I don't think you'd have any trouble figuring out what happened to that pie. Now, that's circumstantial evidence, sure, *but I think most moms or dads would arrive at a conclusion beyond any reasonable doubt* under those circumstances that that child was the one who got into that pie." (Italics added.) It appears two seated jurors heard this version of the illustration. Other versions did not include the "reasonable doubt" language, instead stating, for example, "I don't think any of you would have a problem figuring out what happened to that pie."

### b. Discussion

In assessing defendant's argument that the trial court's raspberry pie example diminished the reasonable doubt standard, the relevant question is whether " 'there is a reasonable likelihood that the jury understood the instructions [as a whole] to allow conviction based on' insufficient proof." (*Daveggio*, *supra*, 4 Cal.5th at p. 840.) There is not.

Defendant claims there is a reasonable likelihood that the raspberry pie example caused prospective jurors to believe their "task was to determine what had actually happened in the case before them, as opposed to whether the prosecution had made a sufficient case for [defendant's] guilt." We disagree. The trial

court explained to each of the four panels of prospective jurors that its example illustrated the concept of circumstantial evidence. We have no reason to doubt that jurors understood this point. The example was merely a portion of the guidance provided to prospective jurors — let alone seated jurors — and the balance of the court's instructions made clear that the People bore the burden of proof beyond a reasonable doubt. (See, e.g., CALJIC No. 2.90; see also *Daveggio*, *supra*, 4 Cal.5th at p. 842 [comments made during jury selection are less significant than instructions at the close of evidence].)[5]

Defendant is on somewhat firmer ground when he complains that the court's example "compared the jurors' duty to decision-making in ordinary life," though only to the extent that he challenges the court's statement that "most moms or dads would arrive at a conclusion *beyond any reasonable doubt* under those circumstances that that child was the one who got into that pie." We perceive no error.

We have explained that "jurors should not be instructed to convict based on the level of certainty needed to make decisions 'in the ordinary affairs of life.' " (*Daveggio*, *supra*, 4 Cal.5th at p. 841, quoting *People v. Brannon* (1873) 47 Cal. 96, 97; but cf. *Victor*, *supra*, 511 U.S. at p. 19; *Holland v. United States* (1954) 348 U.S. 121, 140; *Hopt v. Utah* (1887) 120 U.S. 430, 439.) "Because people often act in important matters notwithstanding substantial uncertainty, the fear is that defining proof beyond a reasonable doubt in relation to a person's willingness to act," even "in the weightier affairs of life," "might understate the

---

[5] Contrary to defendant's suggestion, there is no reasonable likelihood that these or other comments led the jury to believe that it should ignore the court's other instructions.

government's burden of proof." (*Ramirez v. Hatcher* (9th Cir. 1998) 136 F.3d 1209, 1214.)

The trial court's raspberry pie example avoids the core of this concern. The court did not communicate that if jurors had sufficient confidence to make an ordinary or even important life decision, then they had been convinced beyond a reasonable doubt. The court instead provided a commonly used court example of a fictional scenario and indicated that most parents would be able to reach a beyond-a-reasonable-doubt conclusion — having already told prospective jurors what "beyond a reasonable doubt" means. To be clear, we do not condone the court's reference to the reasonable doubt standard in its illustration of circumstantial evidence. (See *Daveggio*, 4 Cal.5th at p. 844 ["We . . . reiterate that 'modifying the standard instruction [on reasonable doubt] is perilous, and generally should not be done . . . .' "].) Nevertheless, we cannot conclude that this brief, inartful pretrial reference to the reasonable doubt standard — a standard the court had already defined properly and would again define after the close of evidence — created any " 'reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*Daveggio*, *supra*, 4 Cal.5th at p. 840.) Accordingly, there was no error.

Shifting away from his arguments regarding the burden of proof beyond a reasonable doubt, defendant further complains that the trial court's comments "violated the evenhandedness which due process demands." This contention is meritless. To the extent defendant claims that the court was not, in fact, evenhanded, the comments he identifies fall far short of establishing that claim. Here, the court had reason to be concerned that at least some jurors were unaware of the rules

governing capital trials. The court's effort to "disabuse" jurors of a possible misconception — in a manner the defense did not find objectionable — in no way hints at partiality. The claim also overlooks examples of the trial court's conduct that were favorable to defendant, including the court's efforts to limit any unduly prejudicial effect of the crime scene video and photographs, and, close in time to the comments at issue here, the court's refusal to ask one of the questions requested by the prosecution.

To the extent defendant claims the court conveyed to jurors an appearance of partiality, the claim also lacks merit. The court's hypothetical, though lengthy and colloquial, did not concern a fact pattern like the case before the prospective jurors, and nothing the court said could reasonably be viewed as a comment on the evidence. Moreover, this claim plucks the court's comment from context. Before jurors filled out questionnaires, for example, the court explained that "we have no idea if we will ever get to the penalty phase of this trial." It further emphasized that "[t]he fact that the defendant is in court for trial or that charges have been made against him is no evidence whatsoever of his guilt. You are to consider only evidence properly received in this courtroom in determining the guilt or innocence of the defendant." The court also instructed seated jurors with CALJIC No. 2.01, which explains when circumstantial evidence is insufficient to support a conviction. And, immediately before the seated jurors began their deliberations, the court instructed them with CALJIC No. 17.30: "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything

I have done or said has seemed to so indicate, you will disregard it and form your own conclusion." We have no persuasive reason to doubt that the jurors followed this instruction.

It may be preferable, as defendant asserts, to use more neutral examples to illustrate the concept of circumstantial evidence, rather than inculpatory fact patterns. (See, e.g., CALCRIM No. 223 ["[I]f a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside"].) Even if the court's framing was error, however, it was plainly harmless under any potentially applicable standard.

## C. Other Claims of Guilt-phase Instructional Error

Defendant complains of several other instructions given during the guilt phase of his trial. Even assuming his claims of error are preserved for our review, none has merit. (Cf. *Daveggio*, *supra*, 4 Cal.5th at p. 840 [explaining that whether failure to object was excused under section 1259 turned on the merits of the claim, and thus "proceed[ing] to consider the merits"].)

### 1. Burden of proof regarding robbery and grand theft

The jury was instructed with CALJIC No. 2.15. The court advised: "If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crimes of robbery and grand theft. Before guilt may be inferred there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight and need not by itself

be sufficient to warrant an inference of guilt. [¶] As corroboration you may consider the attributes of possession[ — ]time, place, and manner[,] that the defendant had . . . an opportunity to commit the crime charged, the defendant's conduct, a false account of how he acquired possession of the stolen property, and any other evidence which tends to connect the defendant with the crime charged." This pattern instruction is "generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime." (*People v. Gamache* (2010) 48 Cal.4th 347, 375.)

Defendant contends this instruction lowered the People's burden of proof. He similarly asserts the instruction permitted the jury to draw an irrational inference, in violation of his right to due process. "We have previously rejected the same arguments, concluding that CALJIC No. 2.15 appropriately permits — but does not require — jurors to infer guilt of burglary, robbery, or theft from the possession of stolen property plus some corroborating evidence, and that it does not violate due process or reduce the burden of proof." (*People v. Grimes* (2016) 1 Cal.5th 698, 730; see also *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 189 ["the jury separately was instructed regarding the elements of both robbery and theft, and there was no suggestion in the challenged instruction that the jury need not find that all of the elements of robbery (or theft) had been proved beyond a reasonable doubt"].) We see no persuasive reason to revisit or distinguish our precedent. Considering "the

entire charge to the jury," there was no error. (*People v. Holt* (1997) 15 Cal.4th 619, 677.)[6]

### 2. *After-acquired intent and robbery*

Defendant contends that by instructing the jury with CALJIC No. 9.40.2, the court misled jurors into believing that they could find defendant guilty of robbery even if his intent to take the Jenkses' property arose after his use of force was complete. We disagree.

CALJIC No. 9.40.2 provides: "To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive an owner of [his] [her] property before or at the time that the act of taking the property occurred. If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed." Defendant rightly observes that it is possible for someone to form an intent to permanently deprive another of property before "the act of taking the property" is complete, but after the use of force has concluded.

The problem with defendant's argument is that CALJIC No. 9.40.2 merely sets out one of several conditions necessary for a robbery conviction, a felony murder conviction based on robbery, or a robbery-murder special-circumstance true finding. The jury was elsewhere "adequately informed concerning the

---

[6] Defendant could be understood to complain of a prosecutor's discussion of this instruction. Any claim of misconduct was forfeited by defendant's failure to object and to request an admonition in the trial court. (*Daveggio, supra,* 4 Cal.5th at p. 853.) Defendant does not argue that any exception to our forfeiture rule should apply with respect to this comment, and none is apparent.

point in time the intent to steal must have been formed" (*People v. Hughes* (2002) 27 Cal.4th 287, 360), because it was instructed with CALJIC Nos. 3.31 (concurrence of act and intent), 8.21 (first degree felony murder in the commission of a robbery), 8.81.17 (murder in commission of robbery), and 9.40 (robbery). (See *Jackson*, *supra*, 1 Cal.5th at pp. 343-344; *Zamudio*, *supra*, 43 Cal.4th at p. 361; *People v. Valdez* (2004) 32 Cal.4th 73, 111-112 & fn. 11; *Hughes*, at pp. 358-360, 363.) Viewing the instructions as a whole rather than evaluating CALJIC No. 9.40.2 in isolation, there was no error.

### 3. *Acquittal-first rule*

Although a jury is free to consider greater and lesser included offenses in whatever order it chooses (see *People v. Kurtzman* (1988) 46 Cal.3d 322, 324-325), a jury may not return a guilty verdict on a lesser offense without also acquitting the defendant of a greater offense (see *People v. Fields* (1996) 13 Cal.4th 289, 309; see also *People v. Anderson* (2009) 47 Cal.4th 92, 114). The jury in this case was correctly instructed on these principles: "[Y]ou are to determine whether the defendant is guilty or not guilty of the crimes charged in Counts 1, 2, 3, and 4 or of any lesser crimes. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdicts. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged crime." (See CALJIC No. 17.10.)

Defendant's trial counsel asked the court to instruct on CALJIC No. 17.10, which describes this so-called acquittal first

rule. Defendant now complains, however, that the rule creates an intolerable risk that a juror may acquiesce to a first degree murder conviction. The hypothesized juror may believe that a defendant is guilty of second degree murder. But, the hypothesis continues, a juror may perceive that fellow jurors will be unwilling to acquit of first degree murder, and thus feel pressured to convict of that offense rather than causing a mistrial. (Cf. *United States v. Tsanas* (2d Cir. 1978) 572 F.2d 346 ["If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge"].) A guilty verdict on second degree murder, with a mistrial on first degree murder, is not an option; "the court cannot accept a guilty verdict on a lesser crime" unless the jury has "unanimously found the defendant not guilty of the [charged] [greater] crime." (CALJIC No. 17.10.)[7]

We have repeatedly rejected challenges to this acquittal-first rule, albeit sometimes in the context of a different pattern instruction. (See *People v. Brooks*, *supra*, 3 Cal.5th at pp. 81-82; *People v. Covarrubias* (2016) 1 Cal.5th 838, 906; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 222-223; *Jurado, supra,* 38 Cal.4th at p. 125; *People v. Cox* (2003) 30 Cal.4th 916, 967; *People v.*

---

[7] Defendant notes in passing that similar pressure may apply when a jury is deciding whether to convict of robbery or a lesser included offense.

*Nakahara* (2003) 30 Cal.4th 705, 715.) We decline to reconsider our precedent.[8]

In light of defendant's thorough and thoughtful briefing on the subject, however, we make one observation. The choice defendant hypothesizes is far afield from requiring a jury to choose between convicting a defendant of a capital crime or convicting him of nothing at all. (Cf. *Beck v. Alabama* (1980) 447 U.S. 625, 627 [death sentence may not be imposed " 'after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict' "].) We presume that jurors follow instructions. There is far less reason to doubt that they will do so when the alternative is a mistrial rather than an acquittal — let alone to believe that they will violate their duty to follow the instructions by convicting of first degree murder rather than by entering a compromise acquittal on that greater charge and agreeing to convict only of second degree murder. The risk of erroneous conviction is particularly diminished because jurors remain free to discuss second degree murder before reaching a verdict on first degree murder; they can acquit of first degree murder with confidence that the defendant will still be convicted of a serious offense.

In any event, it is difficult to imagine that the acquittal-first rule had any effect in this case. There is no reason to believe the rule would have caused jurors to unanimously find

---

[8] Because this claim fails on the merits, it is unnecessary for us to analyze whether trial counsel's request that the instruction be given invited any error or forfeited the claim of error. (See *People v. Bramit* (2009) 46 Cal.4th 1221, 1246.)

true the robbery-murder special-circumstance allegation. That finding thus confirms that the jury unanimously believed defendant was guilty of at least felony murder.

### 4. *Burden of proof regarding the degree of murder*

Defendant contends that another pattern instruction "tended to," among other things, "place the burden of raising a doubt" as to the degree of murder on the defense. We are not persuaded.

The instruction at issue informed the jury: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (See CALJIC No. 8.71 (6th ed. 1996).)

Defendant complains that this "instruction stated, in effect, that the jury had to *find* a doubt in order to *make* the crime of the second degree," and thus "implied that the default finding was first-degree murder." "And if the jury had to be convinced of a doubt to reduce the charge," he continues, "the further implication was that the defendant was the party to do the convincing, by raising one."[9]

---

[9] The record suggests that defendant requested this instruction, again raising the question whether any error was invited. We again decline to resolve this question, because the claim fails regardless.

There is no reasonable likelihood that the jury understood the instruction in this way. (*Estelle v. McGuire* (1991) 501 U.S. 62, 72 & fn. 4.) The instruction governed the jury's conduct only if the jury had been "convinced beyond a reasonable doubt" that defendant was guilty of murder. In other words, the instruction applied only if the prosecution had carried its burden of proving murder (meaning, at minimum, second degree murder) beyond a reasonable doubt. From that point, the instruction redounded to the benefit of the defendant; uncertainty about the degree of the offense would not make first degree murder the default, it would require that the defendant receive the benefit of the doubt — an acquittal on the first degree murder charge. (See *People v. Salazar*, *supra*, 63 Cal.4th at p. 247 (*Salazar*).) Certainly, and contrary to defendant's contention on appeal, the instruction was not stated solely from the viewpoint of the prosecution.

Defendant also argues that the instruction was flawed because it "stated a need for a collective finding" of doubt, notwithstanding his "right to each juror's individual judgment." We have acknowledged that, viewed in isolation, the instruction's focus on whether "you unanimously agree that you have a reasonable doubt" (CALJIC No. 8.71 (6th ed. 1996)) "carr[ies] at least some potential for confusing jurors about the role of their individual judgments" (*People v. Moore* (2011) 51 Cal.4th 386, 411; *id.*, at pp 409-412). Viewing the instructions as a whole, however, there was no error. In context, the jury would have understood the challenged language to refer to the concept, discussed above, that "the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the

defendant not guilty of the charged crime." (See CALJIC No. 17.10; *Salazar*, *supra*, 63 Cal.4th at pp. 247-248.)[10]

The jury was also instructed with CALJIC No. 17.40, which makes clear, in pertinent part: "The People and the defendant are entitled to the individual opinion of each juror. [¶] Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." It is thus not reasonably likely that the jury understood the challenged instruction in the way defendant does on appeal. (See *Salazar*, *supra*, 63 Cal.4th at p. 248 ["Defendant's reading assumes the jury would disregard . . . the explicit directions of CALJIC No. 17.40 emphasizing each juror's duty to decide the case as an individual"].)

## 5. *Consciousness of guilt instruction*

The jury was instructed with CALJIC No. 2.03. The court advised: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient

---

[10] Defendant complains that these instructions "exacerbated" each other's effect. We agree that the instructions jointly made clear the acquittal-first rule, but that was not error, and we do not perceive any other.

by itself to prove guilt, and its weight and significance, if any, are for you to decide." "The cautionary nature of [this] instruction[] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224; accord *Covarrubias*, *supra*, 1 Cal.5th at p. 908 (*Covarrubias*); see also *People v. Page* (2008) 44 Cal.4th 1, 50 & fn. 24.) Defendant nevertheless claims that the trial court erred by giving the instruction. We disagree.

Defendant first argues that the instruction was not applicable to the facts of his case. It was. The morning of August 6, the day after defendant pawned Shirley Jenks's jewelry, defendant spoke with two officers regarding his hatchet. As one officer testified: "[W]e then asked him . . . could we see the hatchet? And then he said he didn't have it, he thought that he lost it. [¶] We then went on to ask him where it could have been lost or how it could have been lost? He told us that he recently had moved from one apartment in the complex to another apartment in the complex and he must have lost it in the move." By contrast, Diana Williams testified that she had seen defendant use the hatchet in his new apartment to hammer speaker wire into place. Moreover, also on August 6, defendant refused to answer Quentin's repeated questions about where the hatchet had gone — conduct undermining defendant's appellate theory that his statement to police about losing the hatchet could have been "an honest mistake." On these facts, the instruction was amply justified. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1254-1255 (*Russell*) [instruction was properly given when the evidence permitted the jury to make a rational inference that the defendant made a false statement to

deflect suspicion away from himself].)  Likewise, the instruction did not invite the jury to draw an irrational inference.

Defendant also claims that the instruction is impermissibly argumentative.  We have repeatedly held otherwise and see no persuasive reason to revisit or distinguish our precedent.  (See, e.g., *People v. Henriquez* (2017) 4 Cal.5th 1, 34; *People v. Nelson* (2016) 1 Cal.5th 513, 552; *People v. Williams* (2015) 61 Cal.4th 1244, 1265; *People v. Bryant* (2014) 60 Cal.4th 335, 438; *People v. Jones* (2013) 57 Cal.4th 899, 971; *People v. Bacon* (2010) 50 Cal.4th 1082, 1108; *People v. Page*, *supra*, 44 Cal.4th at pp. 49-52.)  True, the evidence showed that defendant was otherwise cooperative with officers at around the time he claimed to have lost his hatchet.  But the jury could consider that cooperation in determining whether "[the] defendant made a willfully false or deliberately misleading statement."  (CALJIC No. 2.03; cf. *Russell*, *supra*, 50 Cal.4th at p. 1253 [instruction not argumentative in case in which "[i]mmediately following his arrest, defendant agreed to be interviewed"]; *id.*, at p. 1256.)

### 6. *Requiring unanimous agreement on a theory of first degree murder*

The jury was instructed that "[i]n arriving at a verdict for first degree murder, it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution."  Defendant contends that the jury should have been required to unanimously agree on which of the prosecution's theories had been proved beyond a reasonable doubt:  premeditated and deliberate murder, or robbery felony murder.  We have rejected this argument in the past and see no persuasive reason to revisit the issue.  (See, e.g., *People v. Sattiewhite*, *supra*, 59 Cal.4th at

p. 479; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1354; *People v. Valencia* (2008) 43 Cal.4th 268, 289 (*Valencia*).) We also observe that the jury not only convicted defendant of a standalone robbery charge, but also found true the robbery-murder special-circumstance allegation. At the very least, the special circumstance finding "necessarily demonstrates the jury's determination that the defendant committed felony murder" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 200 (*Gonzalez*)), evincing unanimous agreement on at least that theory of first-degree murder (*Valencia*, at p. 289).

## D. Admission of Report on Galloway's Statement

On rebuttal, an investigator read aloud from his report of an interview with driver Oscar Galloway. Defendant contends the report was hearsay, admitted in violation of state law and the confrontation clause of the Sixth Amendment to the United States Constitution. We conclude that any statutory error was harmless at the guilt phase and that no constitutional violation occurred.

### *1. Background*

Detective Walker spoke with Oscar Galloway at Galloway's residence a few days after the killings. At trial in June 1998, Galloway explained that he was then undergoing cancer treatment and lacked a full and accurate recollection of the events of early August 1997. He did, however, identify defendant in the courtroom; testify that he had driven defendant to a casino "a couple of times"; recall speaking with Walker; and claim that he answered Walker's questions honestly. Galloway acknowledged on cross-examination that he could not recall what he told Walker and was not able to recall when he drove

defendant to the casino. Galloway added that his medical problem did not "really [come] down" on him until October 1997, about two months after the Walker interview.

Over defendant's objection, the trial court allowed the detective to read aloud from his report of the interview. The detective then testified as follows: "Galloway said that on Tuesday, 8-5-97, . . . Potts wanted to go to The Palace and . . . play the slots. He also wanted to go downtown. Galloway said that Potts entered the car with a large blue duffel bag. When Galloway parked his car, Potts exited with the duffel bag and said he would be back shortly. [¶] Galloway stood out in front of the Cottage Bar on Seventh Street talking to a friend until sometime later Potts came back. They then went to The Palace and played the slot machines. Galloway said that they did not stay there very long, however. [¶] Galloway did not think much of it until the next day, 8-6-97, when Potts came to his house and asked him if Potts had left his duffel bag in the back of Galloway's car. Galloway did not know for sure, and he knew that his car was locked, so he and Potts walked together to the car to look for the duffel bag. [¶] According to Galloway, the duffel bag was found on the back seat in the car. Potts retrieved the bag. Galloway noted that the bag did not look as packed as the day before when Potts got out of his car and left for a while."

### 2. Analysis

Defendant first argues that admission of the statement violated the confrontation clause, because "the statement was made out of court and without an opportunity for cross-examination." This argument lacks force, because Galloway was available for cross-examination about the statement at

trial, his memory problems notwithstanding. (See *People v. Cowan* (2010) 50 Cal.4th 401, 467-468.)

Defendant next argues that the statement was inadmissible hearsay, an objection he raised below. The statement was certainly hearsay, but the trial court ruled it admissible under the past recollection recorded exception to the hearsay rule. (See Evid. Code, § 1237.) Defendant contends that two of the exception's requirements were not satisfied. Most notably, he argues that the report was not created "at the time" the statement "was made" (*id.*, § 1237, subd. (a)(2)), because Walker did not record Galloway's statement the morning it was uttered, but instead typed his report at some unspecified time later that day.

It is debatable whether defense counsel objected on this precise ground in the trial court. But the People do not argue that the claim has been forfeited, and the trial court was sufficiently informed to ask Walker, "[d]o you recall when you typed it" and "you believe you wrote up the interview or your record of the interview on August 9th?" Indeed, the People's brief conspicuously fails to mention this objection at all, let alone press forfeiture or engage with defendant's interpretation of the statutory phrase, "at the time it was made."

Because of the People's failure to engage with defendant's argument, we decline to explore whether the argument was preserved or had merit. Instead, we conclude that any error was harmless at the guilt phase. (See *Gonzalez, supra,* 5 Cal.5th at p. 195 [nonstructural state law error evaluated for reasonable probability of a more favorable result]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837.) Defendant contends that Galloway's statement was highly relevant to whether defendant committed

the killings; the statement helped "to explain the absence of jewelry, bloody clothing or shoes, or a hatchet among [defendant's] belongings, because the duffel that was supposedly in Galloway's car at the time of the search contained them." A prosecutor made a similar argument during closing argument. He expected the defense to argue that the lack of evidence found during the 3:00 a.m. search of defendant's apartment soon after the killings indicated that defendant was not the perpetrator. Part of the prosecutor's response to the anticipated argument was that Galloway's statement was "a very significant piece of information," which showed that at least the bag (and, the prosecutor seemed to suggest, "the [hatchet] and the other items") were in Galloway's car that night.

Notwithstanding the prosecutor's rather strong assertion that the evidence was "very significant," it is hard to imagine that the Galloway statement had any impact on the jury's guilt-phase verdict. The lack of hatchet or jewelry found during the 3:00 a.m. search tended to exculpate defendant to the extent that one would expect those items to be found in his apartment. To defeat that expectation, all the jury had to believe was that, in the more than 24 hours between the murders and the search, defendant had left the unpawned jewelry and the hatchet literally anywhere in the world other than inside his apartment. The prosecutor argued this point as well: "One, your common sense tells you, well, not likely, because if you just killed somebody and you had blood all over your clothes, you're going to throw them away, you're not going to keep them around the house. And, two, you might hide the jewelry where people can't find it." Indeed, if the theory is that defendant *retrieved* the items from Galloway's car two days after the killings, then he must have been capable of hiding the items elsewhere, before

the intensive postarrest search of his apartment also failed to uncover those items.

Finally, viewing the record as a whole (including the gaps in the prosecution's case), the evidence that defendant committed the murders was quite strong.  (See *ante*, part II.A.)

**E. Penalty-related Claims**

*1. Admission of report on Galloway's statement*

Defendant contends that the admission of Galloway's statement during the guilt phase prejudiced the jury's penalty determination.  We disagree.

When a defendant claims that evidence admitted in violation of state law at the guilt phase prejudiced the jury's penalty determination, we assess prejudice using the standard for state law penalty-phase error.  (See *People v. Romero*, *supra*, 62 Cal.4th at p. 28.)  Under that standard, "we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error . . . not occurred."  (*People v. Brown* (1988) 46 Cal.3d 432, 448.)  This inquiry is " 'the same in substance and effect' " as the harmless-beyond-a-reasonable-doubt inquiry triggered by federal constitutional error.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 479; see also *Chapman v. California* (1967) 386 U.S. 24.)

Even if Galloway's statement about his outing with defendant had been excluded, there is no reasonable possibility the jury would have reached a different penalty-phase verdict.  Defendant contends that the prosecutor used Galloway's statement to portray defendant as callous, pointing out that the prosecutor said defendant was "off to the casino gambling" the

day after the murders. This reference to gambling was but a tiny sliver of the closing argument, which instead focused on the horrific details of the crime and the effect it had on others.

Defendant similarly contends that although the other evidence at trial would have given jurors "the impression that [he] was so desperate for money that he could not buy food, the testimony admitted in error replaced that image by one of a man willing to kill two people to fund a brief visit . . . to the slot machines." This version of defendant's argument has at least two problems. First, although Galloway's out-of-court statement was the only direct evidence that defendant gambled after killing the Jenkses, it was hardly the only evidence suggesting that the murders were connected to a gambling problem. Galloway testified in court that he had driven defendant to a casino "a couple of times," and Diana Williams testified that defendant had lost money at an out-of-town casino in the days leading up to the Jenkses' murders. Second, and more fundamentally, the brutality of the murders — to say nothing of the sexual assault — overwhelmingly indicated that defendant was not a reluctant killer merely trying to obtain money to buy food. Among other things, jurors had before them a videotape showing Shirley Jenks's body spread across her bed, with one arm clutching her bloodied chest and a throat slit from ear to ear. On these facts, and even considering the case in mitigation and the possibility of lingering doubt, any error was harmless.

### 2. *Excusing jurors based on their views about the death penalty*

A prospective juror may not be excused based on his or her views on capital punishment unless those views would

substantially impair the person's performance of his or her duties as a juror. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424; see also *Witherspoon v. Illinois* (1968) 391 U.S. 510.) Defendant claims the trial court improperly excused seven prospective jurors from the venire based on their opposition to the death penalty, denying him due process and an impartial jury. This claim lacks force, because defendant's trial counsel stipulated to dismissal of those jurors. (See *People v. Booker* (2011) 51 Cal.4th 141, 161 (*Booker*).)

Defendant contends that the stipulations are inconsequential. He observes that at the time of his trial, an objection was not necessary to preserve this sort of claim of error. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643.) In this case, he continues, the trial court itself identified jurors about which it was concerned rather than leaving that task to the parties. Thus, defendant argues, the stipulations here were effectively mere failures to object to the court's anticipated rulings, and his claim is cognizable on appeal.

This argument is not persuasive. To be sure, it appears that the trial court's doubts about whether certain jurors could fairly consider imposing the death penalty prompted it to inquire whether the parties would stipulate to those jurors being excused. What matters, however, is not why defendant's counsel voluntarily stipulated to the dismissals nor how the court might have ruled in the absence of stipulations; it is that the dismissals were made by stipulation. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1061 ["Because of the stipulation, the trial court was not called upon to decide whether these prospective jurors could properly be excused for cause"]; cf. *Booker*, *supra*, 51 Cal.4th at p. 161 [stipulation effective even when "the discussion between the trial court and the parties

focused on the prospective jurors' opinions about the death penalty, and those expressed opinions formed the basis for the parties' decisions regarding whether to stipulate to the dismissal"].) Accordingly, we reject defendant's challenge to the dismissal of these prospective jurors.

### 3. *Lack of instruction regarding victim-impact evidence*

The trial court instructed the jury with various standard instructions explaining the principles governing the jury's penalty determination, including CALJIC Nos. 8.84.1, 8.85, and 8.88. Defendant argues that the trial court had an additional duty to instruct the jury, on the court's own motion, about the proper use of victim impact testimony. "[W]e have repeatedly held that the trial court's use of jury instructions CALJIC Nos. 8.84.1 and 8.85 is sufficient to address a defendant's concerns about the proper use of victim impact evidence, and is consistent with his or her federal and state constitutional rights to due process, a fair trial, and a reliable penalty determination." (*People v. Simon* (2016) 1 Cal.5th 98, 143; see also, e.g., *People v. Johnson* (2015) 61 Cal.4th 734, 780; *People v. Enraca* (2012) 53 Cal.4th 735, 763-764; *People v. Tate* (2010) 49 Cal.4th 635, 708; *People v. Carrington* (2009) 47 Cal.4th 145, 198; *People v. Bramit, supra*, 46 Cal.4th at pp. 1244-1245; *Valencia, supra*, 43 Cal.4th at p. 310.) We see no persuasive reason to revisit or distinguish our precedent.

### 4. *Lack of unanimity requirement for unadjudicated criminal activity*

The People presented evidence that defendant sexually assaulted Carol T. and Diane H. prior to the Jenkses' murders. (See § 190.3, factor (b).) A pattern instruction properly

communicated that a juror could consider that unadjudicated criminal activity as an aggravating factor only if the juror was satisfied, beyond a reasonable doubt, that defendant committed that activity. (See, e.g., *People v. Robertson* (1982) 33 Cal.3d 21, 53-55; see also CALJIC No. 8.87.) The pattern instruction also communicated, however, that it was not necessary for the jury to agree unanimously that defendant did so. Defendant contends that this was error.

We disagree. A penalty-phase jury need not unanimously agree that a defendant engaged in unadjudicated criminal activity; what is required is that the jury's penalty determination as a whole be unanimous. (*People v. Ghent* (1987) 43 Cal.3d 739, 773.) We acknowledge that unadjudicated criminal activity may prove significant to a juror's penalty determination. But we cannot say that this factor is so categorically different from other factors, such as "[w]hether or not the defendant acted under extreme duress or under the substantial domination of another person" (§ 190.3, factor (g)), that unanimity is uniquely necessary in this context. We instead adhere to our settled precedent on this issue. (See e.g., *People v. Landry* (2016) 2 Cal.5th 52, 121; *People v. Bryant*, *supra*, 60 Cal.4th at pp. 451-452; *People v. Burney* (2009) 47 Cal.4th 203, 259-260; *People v. Butler* (2009) 46 Cal.4th 847, 876; *People v. Yeoman* (2003) 31 Cal.4th 93, 164; *People v. Anderson* (2001) 25 Cal.4th 543, 590.) The high court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 does not require a different result. (*Burney*, at pp. 259-260.)

## F. Noncapital Sentencing Claims

### 1. Elderly victim enhancements

In connection with each murder count, the jury found true an allegation that "at the time of the commission of *the above offense* the defendant committed *the above crime* against a person 65 years of age or older and that this condition was known or reasonably should have been known to the defendant within the meaning of section 667.9(a) of the Penal Code." (Italics added.) Based on these findings and a prior strike under the "Three Strikes" law, the court imposed a four-year enhancement (two one-year determinate terms, doubled). Defendant claims that murder is not one of the crimes eligible for enhancement under section 667.9, subdivision (a). The People confess error, but assert that since robbery is an eligible crime, and the same information charged defendant with robbery, "the enhancement should still be applied to the robbery count." The People cite no authority suggesting that we can, let alone must, transfer the jury's finding to the robbery count. We decline to do so.

### 2. Restitution fine

The trial court ordered defendant to pay a $10,000 restitution fine. Defendant acknowledges that at the time he was sentenced, the applicable version of section 1202.4 permitted the trial court to consider his inability to pay in setting the amount of the fine. Subdivision (c) of that section instructed that "[a] defendant's inability to pay shall not be considered a . . . reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the two-hundred-

dollar ($200) or one-hundred-dollar ($100) minimum." (Stats. 1997, ch. 527, § 4, p. 3215.) Subdivision (d) added that "[i]n setting the amount of the fine pursuant to subdivision (b) in excess of the two-hundred-dollar ($200) or one-hundred-dollar ($100) minimum, the court shall consider any relevant factors including, but not limited to, the defendant's inability to pay . . . ." (*Ibid.*)

Defendant contends that the trial court set the $10,000 amount based on erroneous information about whether defendant would be permitted to work while incarcerated. In particular, the probation officer reported: "The defendant will be imprisoned for an extended period of time. Therefore, it is your officer's opinion, during the time he is imprisoned he is capable of earnings, therefore, capable of paying for the fines as ordered by the Court." On appeal, the People do not dispute that condemned inmates are not permitted to work, nor that the trial court can be assumed to have relied on the probation officer's error. They also do not contend that defendant has forfeited any claims based on that error. (Cf. *People v. Gallardo* (2017) 4 Cal.5th 120, 128 ["Forfeiture is not a jurisdictional doctrine"].) We will thus assume, for argument's sake, that the trial court abused its discretion when it initially imposed a $10,000 restitution fine.

In the unusual circumstances of this case, however, we conclude that any error was harmless beyond a reasonable doubt. Although we assume that the trial court imposed the initial restitution fine with the belief that defendant could work while incarcerated, as discussed below, we are confident that the trial court would have imposed the same fine even in the absence of that belief. We also conclude that such a fine would have been lawful.

Long after sentencing, in 2007, defendant filed a "Motion to Modify Restitution Fine" in the trial court. He brought the probation officer's error to the court's attention, arguing that he was unable to pay the $10,000 fine and that a lower fine should be imposed. The thrust of his argument was that his only source of income was the small gifts he occasionally received, and that the fine would result in up to 55 percent of those gifts being withheld — interfering with his ability to satisfy his basic needs by purchasing items at the commissary. The same judge that initially sentenced defendant refused to modify the fine. The court reasoned that seizing a portion of defendant's income, rather than all of it, "seems a minimal burden considering the incredible loss that was inflicted, not only on the victims, but on their daughter, who suffered catastrophic emotional consequences." The court continued, "We . . . don't have any evidence of her current status. The last time the Court had information, it would appear she was still suffering and would probably always be disabled because of the emotional trauma that she experienced. [¶] I see no reason to revisit the Court's earlier order and modify that restitution fine. The defendant's ability to pay is taken into consideration by the Department of Corrections when it makes its deductions and makes payments toward that restitution liability. So I'm going to deny the motion." Given these comments, we are confident that the trial court would have imposed the same fine even ignoring the probation officer's error.[11]

---

[11] We rely on the trial court's comments solely as a guide to whether the probation officer's error had any prejudicial effect. We express no opinion on whether the trial court had authority to consider all or part of the motion.

We further conclude that, had the court imposed the same fine in the absence of the probation officer's error (and in the face of a similar objection), the fine would have been lawful. Defendant first argues that the court's rationale in ruling on the 2007 motion "strip[ped] the criterion of ability to pay of all meaning" because the deduction at issue is taken from all prisoners. We do not understand the trial court to have meant that all prisoners are necessarily able to pay because they will lose only a portion of their income in prison. Instead, we understand the court to have indicated that the significance of defendant's difficulty paying was blunted by the fact that he would retain at least some of the money sent to him. Indeed, defendant — unlike prisoners whose release is anticipated — would seem to be subject to deduction rules governing prisoners for the rest of his life.[12]

Defendant also appears to suggest that a fine is automatically invalid if a defendant is unable to pay it. We disagree. Inability to pay is a factor for the court to consider in setting the amount of a restitution fine, alongside "any relevant factors including, but not limited to, . . . the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses

---

[12]    We do not suggest that a court satisfies its obligation to "consider any relevant factors, including, but not limited to, the defendant's inability to pay" merely by noting that the Department of Corrections and Rehabilitation considers ability to pay. (§ 1202.4, subd. (d).) The point is that a trial court considering the burden that a restitution fine will impose on a capital inmate may properly consider evidence that the inmate will retain a portion of his income, fine notwithstanding.

as a result of the crime, and the number of victims involved in the crime." (Former § 1202.4, subd. (d); see also *ibid.* ["Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime"].) The court was permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations.

Our decision in *People v. Lewis* (2009) 46 Cal.4th 1255 (*Lewis*) is instructive. We explained: "Defendant's argument in the trial court — that the imposition of a large restitution fine, which would be deducted from a portion of any funds given to defendant by his family to purchase personal items such as toothpaste, would be 'an additional indignity' — did not establish that imposing the maximum fine of $10,000 would be inappropriate under section 1202.4. On the contrary, his argument contemplated that defendant would have funds in the future from which restitution could be paid, and thus contradicted the view that defendant would be unable to pay the fine. Defendant's theory on appeal — that the trial court disregarded his inability to pay the fine — also fails. The court clearly considered that possibility as a factor, but defendant's assertion that he was unable to pay the fine did not compel the court to impose a lesser fine. In light of the offenses committed by defendant and the harm he caused to the victim and her children, we find no abuse of discretion in the trial court's determination that a fine in the amount of $10,000 was appropriate." (*Id.*, at p. 1321.)[13]

---

[13] Given the force of this competing consideration, and that this rationale accounts for defendant's ability to pay, the fine

*People v. Viera* (2005) 35 Cal.4th 264 is not to the contrary. In *Viera*, we held that a defendant ordered to pay a restitution fine at a time when a court could not consider inability to pay was entitled to a remand, so that the court could consider the restitution fine under current statutory criteria. (See *Viera*, at pp. 305-306; *Covarrubias*, *supra*, 1 Cal.5th at p. 935.) We further indicated that "[i]f the People choose not to contest the matter on remand, defendant's restitution fine shall be reduced to the statutory minimum" (*Viera*, at p. 306) — the best result Viera could have obtained at a contested hearing. Defendant claims this statement implies that "if a defendant prevails in showing inability to pay, the fine should be the minimum, regardless of such factors as the seriousness of the offense." He is mistaken; we left the People free to contest the matter on remand, and the trial court free to conclude that, notwithstanding any difficulty Viera may have had in paying, a fine higher than the statutory minimum would be appropriate. The court in this case had that discretion as well.

## G. Cumulative Effect of Errors Identified or Assumed

Defendant contends that he is entitled to relief based on the cumulative effect of the errors he claims to have identified. We disagree.

We have assumed error regarding defendant's challenge to the trial court's illustration of circumstantial evidence and to the admission of Galloway's statement. Considered cumulatively, these assumed errors provide no basis for

---

would not be excessive, deny defendant due process, or deny him equal protection of the laws.

reversal. The Galloway statement had no bearing on the jury's understanding of circumstantial evidence. And although it would have been preferable for the court's illustration of circumstantial evidence to be more neutral, we have already concluded that the illustration was harmless in light of the record as a whole — including the Galloway statement.

We have also found or assumed error regarding the elderly victim enhancements and the amount of the restitution fine. Here, too, there is no cumulative prejudice. The fact that the elderly victim enhancements were attached to the wrong counts (murder, not robbery) would have no effect on any other aspect of the jury's deliberations. And the jury did not even set the amount of the restitution fine, which had no effect on the rest of the sentence.

Defendant also argues that even if there were no individual errors, he is still "entitled to reversal if his trial was unfair or its result unreliable." Viewing the record as a whole, we cannot say that defendant was denied a fair trial or a reliable judgment.

## H. Constitutionality of California's Death Penalty Scheme

Defendant argues that California's death penalty scheme is unconstitutional. He advances one argument he believes we have yet to consider and several he concedes we have rejected in the past. He also contends that the duration of his confinement under his death sentence constitutes cruel and unusual punishment, which should be relieved by vacating that sentence. None of these arguments has merit.

## 1. *Burden of proof*

We have held that " '[t]he death penalty is not unconstitutional for failing to impose a specific burden of proof as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence.' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1232; see also *People v. Rangel, supra*, 62 Cal.4th at p. 1235 [discussing burden of proof regarding "Pen. Code, § 190.3, factor (b) or factor (c) evidence"].) As we explained nearly 30 years ago, "[a]t the penalty phase, each juror must determine, through the weighing process, which of the two alternative penalties is the more appropriate. Because the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion. [Citation.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 643 (*Hayes*).)

Defendant contends that various provisions of the Evidence Code entitled him to an instruction that the prosecution had the burden of proof and persuasion at the penalty phase, or alternatively, an instruction that there was no such burden. (See Evid. Code, §§ 500, 502, 520, 550.)

Evidence Code section 500 states, "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." Defendant argues that "[i]n a capital case, the prosecution's demand for the death sentence is a claim for relief." Even assuming the truth of that premise for the sake of argument, defendant fails to identify any essential fact that the prosecution must prove at the penalty

phase, after the jury has already found the special circumstance allegations true beyond a reasonable doubt.

Evidence Code section 502 requires the court, "on all proper occasions," to "instruct the jury as to which party bears the burden of proof on each issue . . . ." Our observation that the penalty phase "is essentially moral and normative [citation], and therefore different in kind from the determination of guilt" (*Hayes*, *supra*, 52 Cal.3d at p. 643), implies the penalty phase is not a "proper occasion[]" (§ 502) within the meaning of this generally applicable rule of evidence. (See *People v. Holt*, *supra*, 15 Cal.4th at p. 684 [notwithstanding section 502, "because capital sentencing is a moral and normative process, it is not necessary to give instructions associated with the usual factfinding process"].)

Evidence Code section 520 provides that "[t]he party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue." We have repeatedly held that this provision does not require an instruction placing the burden of proof on the People at the penalty phase, and we see no persuasive reason to reconsider our precedent. (See, e.g., *People v. Brooks*, *supra*, 3 Cal.5th at p. 115; *People v. Whalen* (2013) 56 Cal.4th 1, 90; *People v. Clark*, *supra*, 52 Cal.4th at pp. 1007-1008; *People v. Cowan*, *supra*, 50 Cal.4th at p. 509; *People v. Dykes* (2009) 46 Cal.4th 731, 814; *People v. Leonard* (2007) 40 Cal.4th 1370, 1429; *People v. Abilez* (2007) 41 Cal.4th 472, 534; *People v. Dunkel* (2005) 36 Cal.4th 861, 939; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 ["Defendant advances no meritorious reason for us to reconsider the rule that, apart from other-crimes evidence, the jury need not be instructed on the burden of proof at the penalty phase"].)

Finally, Evidence Code section 550 instructs: "(a) The burden of producing evidence as to a particular fact is on the party against whom a finding on that fact would be required in the absence of further evidence. [¶] (b) The burden of producing evidence as to a particular fact is initially on the party with the burden of proof as to that fact." Again, given the "essentially moral and normative" character of the penalty phase (*Hayes*, *supra*, 52 Cal.3d at p. 643), and that the jury does not return a collective "finding" of "fact" (§ 550, subd. (a)), this provision does not require the instruction defendant requests.

We have also held that "the trial court is not required to explicitly tell the jury that neither party bears the burden of proof." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1429; see also, e.g., *People v. Parker*, *supra*, 2 Cal.5th at p. 1232; *People v. Bunyard* (2009) 45 Cal.4th 836, 861.) None of defendant's arguments provides any persuasive reason to reconsider that conclusion. We note that CALJIC No. 8.88 advised the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Accordingly, we see no merit to defendant's contention that, absent a no-burden-of-proof instruction, "there is the possibility that a juror would vote for the death penalty because of a misallocation — to [defendant] — of a nonexistent burden of proof."

### 2. *Previously considered challenges*

We have previously considered and rejected the other arguments defendant raises on appeal. We see no persuasive reason to reexamine the following conclusions:

The class of murderers eligible for the death penalty is not impermissibly broad. (See *People v. Lopez* (2018) 5 Cal.5th 339, 370 (*Lopez*); § 190.2.)

Directing the jury to consider "[t]he circumstances of the crime" (§ 190.3, factor. (a)) does not result in arbitrary and capricious punishment (*People v. Ghobrial* (2018) 5 Cal.5th 250, 291 (*Ghobrial*)). Adjectives such as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (§ 190.3, factor (g)) do not unconstitutionally impede consideration of mitigating evidence. (*People v. Delgado* (2017) 2 Cal.5th 544, 591-592.)

"The death penalty statute 'is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt.' " (*Lopez*, *supra*, 5 Cal.5th at p. 370.)

CALJIC No. 8.88's use of "the phrase 'so substantial' is not impermissibly vague or ambiguous." (*Ghobrial*, *supra*, 5 Cal.5th at p. 292.) Directing the jury to determine whether the death penalty is warranted, rather than appropriate, is not error. (*Ibid.*) It is not necessary to instruct "that a life sentence is mandatory if the jury finds that the factors in mitigation outweigh the factors in aggravation." (*Ibid.*) "The instruction is not deficient for failing to specify that defendant had no burden of proof with respect to the circumstances in mitigation. [Citation.] Nor is it deficient for failing to inform the jury that there was no need for unanimity as to those circumstances . . . . [Additionally], '[t]he trial court's failure to instruct the jury on the presumption of life did not violate defendant's constitutional

rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protections of the laws.' " (*Id.*, at p. 292-293.)

CALJIC No. 8.85 identifies several factors for the jury to consider, "if applicable," "[i]n determining which penalty is to be imposed." A trial court is not required to delete inapplicable mitigating factors, nor to identify whether factors are mitigating or aggravating. (*Lopez, supra*, 5 Cal.5th at p. 371.) "We have consistently rejected state and federal law claims that a trial court must specifically instruct on lingering doubt because the concept is sufficiently covered in CALJIC No. 8.85." (*People v. Enraca, supra*, 53 Cal.4th at p. 767.)

A trial court need not inform the jury to ignore " 'the deterrent or nondeterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a prisoner for life without the possibility of parole' " "where 'neither party raise[s] the issue of either the cost or the deterrent effect of the death penalty . . . .' " (*Zamudio, supra*, 43 Cal.4th at p. 371.)

" 'Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required.' " (*Lopez, supra*, 5 Cal.5th at p. 371.) " 'The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants.' [Citation.] [¶] California's death penalty does not violate international law or international norms of decency." (*Ibid.*)

We see no persuasive reason to conclude that these aspects of our system, considered cumulatively, are constitutionally infirm. (See *People v. Anderson* (2018) 5 Cal.5th 372.)

### 3. *Duration of confinement on death row*

Defendant was sentenced to death more than twenty years ago. He contends that his prolonged time on death row constitutes cruel and unusual punishment. To the extent defendant argues "that delay inherent in the automatic appeal process . . . is cruel and unusual punishment," we disagree. (*People v. Anderson, supra*, 25 Cal.4th at p. 606.) To the extent he claims that the prison conditions imposed on capital inmates are unconstitutional, at least after an extended period of time, the record is insufficient to support the claim. The record is also insufficient to support a claim that delays have made actual executions unconstitutionally arbitrary. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1372-1375.) Defendant offers no persuasive reason to distinguish or reconsider these precedents.

## III. DISPOSITION

We modify the judgment by striking the four-year determinate term imposed for the elderly victim enhancements. The trial court is directed to send to the Department of Corrections and Rehabilitation a corrected abstract of judgment with the enhancement stricken. We affirm the judgment as modified, including the judgment of death.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**SIMONS, J.**[*]

---

[*] Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. POTTS

S072161

Concurring Opinion by Justice Liu

Today's decision is our first to affirm a death judgment since Governor Newsom signed Executive Order N-09-19 effecting a moratorium on capital punishment in California. Neither defendant nor the Attorney General has suggested that the Executive Order raises any new issues bearing on this appeal. We thus decide this case on the claims and arguments as submitted.

And yet, as the Executive Order underscores, our decision affirming the judgment does not alter a fundamental reality: A death sentence in California has only a remote possibility of ever being carried out. As leaders of the judiciary have long observed, the death penalty presents serious challenges for the fair and efficient administration of justice. For decades, those challenges have not been meaningfully addressed. As a result, California's death penalty is an expensive and dysfunctional system that does not deliver justice or closure in a timely manner, if at all.

This case is instructive: The death judgment was issued in 1998. Now, 21 years later, we affirm the judgment on direct appeal, but there is more litigation to come in the form of habeas corpus petitions in state and federal courts. This timeline is typical of our capital cases. (See, e.g., *People v. Johnson* (2018) 6 Cal.5th 541 [20 years between judgment and affirmance on direct appeal]; *People v. Powell* (2018) 6 Cal.5th 136 [24 years];

*People v. Spencer* (2018) 5 Cal.5th 642 [22 years]; *People v. Wall* (2017) 3 Cal.5th 1048 [23 years]; *People v. Jones* (2017) 3 Cal.5th 583 [19 years]; *People v. O'Malley* (2016) 62 Cal.4th 944 [25 years]; *People v. Cunningham* (2015) 61 Cal.4th 609 [19 years]; *People v. Brown* (2014) 59 Cal.4th 86 [18 years].)  In two recent cases, we reversed the death judgment and remanded for a new penalty trial; each defendant lived for over a decade under an unconstitutional sentence.  (See *People v. Armstrong* (2019) 6 Cal.5th 735 [15 years between judgment and reversal]; *People v. Buenrostro* (2018) 6 Cal.5th 367 [20 years].)  And in one recent case, we vacated a capital conviction because of false evidence; that defendant was released after serving 25 years on death row.  (*In re Figueroa* (2018) 4 Cal.5th 576.)

The Executive Order describes California's death penalty system as "wasteful" and "protracted."  (Governor's Exec. Order No. N-09-19 (Mar. 13, 2019); see *ibid.* ["[S]ince 1978, California has spent $5 billion on a death penalty system that has executed 13 people."].)  In this respect, the Executive Order echoes the assessment of numerous leaders of the justice system over many years.

These leaders include two Chief Justices of our state, whose collective tenure atop the judicial branch spans more than two decades.  In his memoir, former Chief Justice Ronald George described California's death penalty system as a "protracted and dysfunctional process" that "places the administration of justice and all of the courts, state and federal, and government as a whole, in a very bad light."  (George, Chief: The Quest for Justice in California (2013) p. 523 (George).)  "My ultimate concern," he wrote, "is that we're expending a tremendous amount of effort and expense to impose death sentences and send people to death row under circumstances

that almost totally undermine the deterrent effect of the death penalty. A person sentenced to death knows that he or she in effect is being given a life-without-parole sentence, because the odds are that he or she is going to die of old age behind bars." (*Id.* at p. 541; see Cal. Dept. of Corrections and Rehabilitation, Condemned Inmates Who Have Died Since 1978 (Mar. 8, 2019) [120 inmates have died on death row for reasons other than execution since 1978, the vast majority due to natural causes].)

Our current Chief Justice has similarly observed that California's death penalty is " 'not effective' " and in need of " 'structural change.' " (Dolan, *California Chief Justice Urges Reevaluating Death Penalty*, L.A. Times (Dec. 24, 2011) (Dolan); see *ibid.* [" 'I don't know if the question is whether you believe in it anymore. I think the greater question is its effectiveness . . . .' "].) According to the Chief Justice, it is worth "asking whether the criminal justice system can 'make better use of our resources.' " (*Ibid.*; see Shafer, *California's Chief Justice: Hard to Say the Death Penalty Is Working*, KQED: The California Report (Jan. 23, 2015).)

In 2014, U.S. District Judge Cormac Carney likewise concluded in a lengthy opinion that the administration of the death penalty in California is "dysfunctional." (*Jones v. Chappell* (C.D.Cal. 2014) 31 F.Supp.3d 1050, 1053, revd. *sub nom. Jones v. Davis* (9th Cir. 2015) 806 F.3d 538 [finding petitioner's claim procedurally barred].) "California's death penalty system is so plagued by inordinate and unpredictable delay that the death sentence is actually carried out against only a trivial few of those sentenced to death." (*Jones v. Chappell*, at p. 1062.) Judge Carney cited Senior Judge Arthur Alarcón of the United States Court of Appeals for the Ninth Circuit, who exhaustively chronicled the "unconscionable delay" in the death

penalty system due to "dysfunctional procedures." (Alarcón, *Remedies for California's Death Row Deadlock* (2007) 80 So.Cal. L.Rev. 697, 697, 711.)

In 2008, the Legislature created a blue-ribbon commission of law enforcement officials, prosecutors, public defenders, and scholars — chaired by former Attorney General and Los Angeles County District Attorney John Van de Kamp — to study the issue. (Cal. Com. on the Fair Admin. of Justice, Final Report (2008) (Commission Report).) The Commission concluded that "California's death penalty system is dysfunctional" and emphasized two major sources of dysfunction: "The system is plagued with [1] excessive delay in the appointments of counsel for direct appeals and habeas corpus petitions, and [2] a severe backlog in the review of appeals and habeas petitions before the California Supreme Court." (*Id.* at pp. 111, 114–115.)

As to the first issue, "[c]apital defendants are entitled to counsel on direct appeal and in state habeas proceedings. (See *Douglas v. State of California* (1963) 372 U.S. 353, 355 . . . ; Gov. Code, § 68662.) [¶] On average in California, it takes three to five years after a death judgment to appoint appellate counsel. In April 2016, there were 49 capital defendants waiting for attorneys to be appointed for direct appeals and 360 capital defendants waiting for attorneys to be appointed for habeas corpus petitions. About half of those waiting for appointment of habeas counsel have been waiting for over 10 years." (*Briggs v. Brown* (2017) 3 Cal.5th 808, 864 (*Briggs*) (conc. opn. of Liu, J.), citations omitted.) To address the difficulty of appointing counsel, the 2008 Commission Report recommended increasing the budget of the Office of the State Public Defender by one-third, substantially increasing the compensation of private attorneys who take capital cases, and dramatically expanding

the Habeas Corpus Resource Center. (Commission Report, *supra*, at pp. 132–135.) These recommendations have never been implemented or put to the voters. (See George, *supra*, at p. 524 [discussing unsuccessful efforts to obtain increased funding for death penalty reforms].)

As to the second issue, the state Constitution assigns the California Supreme Court exclusive jurisdiction over appeals from judgments of death. (Cal. Const. art. VI, § 11, subd. (a).) "[T]he fact that all appeals go to a single court . . . inevitably result[s] in a bottleneck." (*Briggs*, *supra*, 3 Cal.5th at p. 869 (conc. opn. of Liu, J.); see *id.* at p. 864 ["In April 2016, there were 337 direct appeals . . . pending in this court."].) The 2008 Commission Report endorsed the recommendation of then Chief Justice George to amend the state Constitution so that the California Supreme Court would have discretion to transfer death penalty appeals to our intermediate appellate courts. (Commission Report at pp. 147–148.) This recommendation also has never been implemented or put to the voters.

In 2016, the electorate approved Proposition 66, the Death Penalty Reform and Savings Act, an initiative "intended to facilitate the enforcement of [death] judgments and achieve cost savings in capital cases." (*Briggs*, *supra*, 3 Cal.5th at p. 822.) Among other things, Proposition 66 sets forth new procedures governing habeas corpus petitions (Pen. Code, §§ 1509, 1509.1), new rules for granting extensions of time for briefing (*id.*, § 1239.1, subd. (a)), new rules for appointing counsel (*id.*, § 1239.1, subd. (g)), and a reorganization of the Habeas Corpus Resource Center (Gov. Code, §§ 68661, 68661.1, 68664). Proposition 66 also directs the Judicial Council to adopt rules and standards "designed to expedite the processing of capital

appeals and state habeas corpus review" within 18 months of the initiative's effective date. (Pen. Code, § 190.6, subd. (d).)

Although the efficacy of Proposition 66 "remains to be seen" (*Briggs*, *supra*, 3 Cal.5th at p. 860), two things are clear. First, Proposition 66 cannot possibly achieve its objectives unless California devotes considerable additional resources to its judicial branch. (See *Briggs*, at p. 860 ["Much depends on the funding made available by the Legislature."].) While directing this court to appoint counsel for indigent appellants "as soon as possible" (Pen. Code, § 1239.1, subd. (a)) and directing trial courts after entry of a death judgment to "offer counsel to the prisoner" for a habeas corpus petition (*id.*, § 1509, subd. (b)), the initiative does not provide for additional resources to increase the pool of attorneys who are qualified and willing to accept these assignments. And while dispersing habeas corpus petitions to the trial courts and Courts of Appeal and directing those courts to proceed "expeditiously" (Pen. Code, §§ 1509, subd. (f), 1509.1, subd. (c)), the initiative does not allocate additional resources to those courts. (See *Briggs*, at p. 860 ["Proposition 66 presumes that the courts will have sufficient resources to manage their caseloads."].)

Second, while stating that it is this court's "duty" to "expedite the review" of capital cases (Pen. Code, § 1239.1, subd. (a)), Proposition 66 does not alter this court's exclusive jurisdiction over direct appeals. A proposed initiative in 2014 did contain a constitutional amendment to provide our intermediate courts of appeal with direct appellate jurisdiction in capital cases. But the proposed initiative was abandoned, and Proposition 66 did not include any constitutional amendment. (See *Briggs*, *supra*, 3 Cal.5th at pp. 865–866 (conc. opn. of Liu, J.).)

Proposition 66 thus did not enact or put to the voters the key reforms that leading authorities consider fundamental to a workable death penalty system. Proposition 66 did not reduce the bottlenecking of direct appeals in this court. It did not provide additional resources to enable this court, the courts of appeal, or the trial courts to expedite capital cases. And it did not provide additional resources for appointment of qualified counsel.

Nevertheless, Proposition 66 was presented to the voters as a measure that "***Requires Completion of Direct Appeal and Habeas Corpus Petition Process Within Five Years***" and generally requires trial courts to resolve initial habeas corpus petitions within one year. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016), analysis of Prop. 66 by Legis. Analyst, p. 106 (italics and boldface in original); see Pen. Code, §§ 190.6, subd. (d), 1509, subd. (f).) In these respects, Proposition 66 promised more than the system can deliver. As this court unanimously held in *Briggs*, the time limits — "presented to the voters by the proponents of Proposition 66 without the benefit of hearings or research exploring their feasibility or their impact on the rest of the courts' work" — so plainly threaten to impair the judicial function that they cannot be given any binding effect. (*Briggs*, *supra*, 3 Cal.5th at pp. 860–861; see *id.* at pp. 858–860; *id.* at p. 872 (conc. opn. of Liu, J.); *id.* at pp. 872–873 (conc. & dis. opn. of Cuéllar, J.).) In enacting time limits "so sweeping in [their] objective yet so vague on the means of accomplishing the objective," the voters were never asked to "make difficult choices as to what should be sacrificed for the sake of dramatically expediting the death penalty." (*Id.* at p. 871 (conc. opn. of Liu, J.).) Avoiding these hard choices serves only to perpetuate the current dysfunction.

7

I express no view here on the morality or constitutionality of the death penalty. Since joining this court, I have voted to affirm scores of death judgments, and I will continue to do so when the law requires. It is impossible to review these cases without feeling tremendous compassion for the victims and their families, who have suffered unimaginable heartbreak and loss. But the promise of justice in our death penalty system is a promise that California has been unable to keep. We are overdue for what our Chief Justice has called "a merit-based discussion on [the death penalty's] effectiveness and costs." (Dolan, *supra*.) In the meantime, the judiciary will continue to do its duty under the law, leaving it to the voters and our elected representatives to decide whether California should double down on the current system or chart a new course.

**LIU, J.**

**I Concur:**

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Potts
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S072161
**Date Filed:** March 28, 2019
_____

**Court:** Superior
**County:** Kings
**Judge:** Louis F. Bissig

_____

**Counsel:**

Michael P. Goldstein, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Maggy Krell, Ryan B. McCarroll and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael P. Goldstein
Law Office of Michael P. Goldstein
PMB 9122
5000 MacArthur Boulevard
Oakland, CA  94613
(510) 910-7220

Sally Espinoza
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 210-6282