Filed 9/5/25  P. v. Romero CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE LOZANO ROMERO,<br><br>Defendant and Appellant. | D082771<br><br>(Super. Ct. No. SCN418449) |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Jose Lozano Romero appeals from a judgment following a conviction on one count of first degree murder in violation of Penal Code section 187, subdivision (a), and one count of arson of an inhabited structure in violation of Penal Code section 451, subdivision (b).  He contends the first degree murder conviction should be reversed or reduced to second degree murder

because substantial evidence did not support it. The Attorney General disagrees, and so do we. Hence we affirm.

## I.
## BACKGROUND

This case arises from an October 4, 2020, encounter between Romero and his former housemate, Procopio Cervantes. Shortly after 10:00 a.m. that day, Romero parked his truck in front of a home that the two once had shared and in which Cervantes still lived. Cervantes greeted him at the gate and walked with him into the house. About an hour later Romero exited the house alone and returned to his truck—wearing a shirt other than the one he'd been wearing when he entered; bleeding from a cut on his hand; and carrying on his shoulder a dresser drawer from Cervantes's bedroom. He placed the drawer in his truck and drove away. Minutes later, the house was engulfed in flames and smoke. Inside lay Cervantes, covered in blood, on the kitchen floor.

Firefighters pulled Cervantes from the house and tried to revive him, but to no avail. A deputy medical examiner performing an autopsy concluded Cervantes had been stabbed five times in the head and seven times in the torso, that the force used to stab him had fractured four of his ribs, that the objects—two knives—used to stab him had pierced his lungs, kidney, stomach, pancreas, and pericardium (lining surrounding the heart), that Cervantes had sustained 32 incisional wounds (18 to the head, one to the torso, and 13 to the extremities) and a number of burn wounds, and that multiple sharp force injuries (rather than effects of the fire) were the cause of death.

### A. People's Evidence

At trial, the People presented evidence that Cervantes and his romantic partner—Juan Penalosa, who had died by suicide several months before the

2

events described above—had kept large quantities of cash at the house. The People also presented evidence that Cervantes had stored this cash, in the form of stacks of bills bundled together with rubber bands, in one or more dresser drawers in his bedroom and in his bedroom closet. In addition, they elicited testimony that Romero had lived in the house for several months earlier that year and that he had expressed to several individuals a desire to return to the house to retrieve some property.

The People also presented evidence that, subsequent to the encounter, detectives executed a search warrant at Romero's mobile home, that they found in the mobile home three stacks of $20 bills, each consisting of $1,000 (or, in the case of one bundle, $1,020) bundled together with rubber bands, and that many if not most of these bills were stained with Romero's blood.

In addition the People presented evidence that, within a few days after Cervantes's death, Romero had told an acquaintance that he (Romero) and his wife had been arguing because he had spent money that she had intended for them to use to purchase a trailer, that a search of Romero's wallet and truck had yielded receipts or vouchers dated September 25 and October 2, 2020, from a local casino, that Romero had owed money to Penalosa at the time of Penalosa's death, and that, after Penalosa's death, Penalosa's daughter had asked Romero to repay it.

The People also presented testimony from an investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), who opined that the fire had originated in three locations in the house (two in Cervantes's bedroom and one in the living room); that it had been started with "an ignitable liquid"; that all five knobs on the stove had been found in the on position after the fire had been extinguished; and, that the fire had been intentionally ignited.

3

## B.  Romero's Testimony

Confronted with this evidence, Romero took the stand and admitted that he had been aware Cervantes was accustomed to keeping large quantities of cash at the house.  He also admitted that he and Cervantes had engaged in a violent fight that commenced in the living room and ended in the kitchen and that, at the conclusion of the fight, he (Romero) had gone into Cervantes's bedroom to change from the torn and bloody shirt he was wearing into a clean shirt from Cervantes's closet.  In addition, he admitted that he had taken the dresser drawer from the bedroom to his truck and that he set the house alight before leaving.  But, in his telling, he was not the aggressor, he did not steal money from Cervantes, and he acted only in self-defense.

According to Romero, Cervantes and Penalosa were not just his former housemates but also his friends.  Romero had come to the house that fateful day intending only to retrieve property he had loaned to Penalosa, and without any intent to kill or steal from Cervantes.  After he began looking for his property, Cervantes told him that he had something to give him—a letter that Penalosa had left for Romero before his suicide.  Cervantes then invited Romero to stay for a drink.  But while the two of them were in the living room together, Cervantes "touched [Romero's] private parts . . . and . . . tried to kiss [him]."  This angered Romero and prompted him to push Cervantes, whereupon Cervantes "picked up a knife" and blocked the door to the outside.  There then ensued a violent fight—involving two knives, a pot, and shards from two broken bottles—during which Romero's hand was cut and at the conclusion of which Cervantes lay "covered in blood" on the kitchen floor making "strange . . . choking noises."

While in Cervantes's bedroom (where he had gone to change his shirt) after the fight, Romero "saw a dresser drawer with a bunch of envelopes," so,

4

"thinking about that letter from [Penalosa]," he "grabbed the drawer and . . . took it with" him. Then, as he was preparing to leave, he spotted a lighter on a bench; and "the only thing that crossed [his] mind was to turn around and set fire to the house."

Romero offered several explanations for setting the house alight. One was: "I was thinking that maybe [Penalosa]'s letter—maybe I had left it behind, and I wanted to make sure that that letter did not stay behind." Another was: "I wasn't thinking. . . . I felt like I wasn't in my right mind. I was panicked. I was crying. I was very traumatized." A third was "that there's this movie that's one of my favorites. It's called 'Shooter.' And after there's this fight in a house, [one of the characters] just leaves and he sets fire to the house."

Romero further testified that, after leaving the scene, he drove to his place of employment, received three stacks of $20 bills totaling $3,000 from his supervisor, and then, at some point thereafter, drove home and left the $3,000 there. It was this $3,000 from his employer, he explained, (not any money from Cervantes's house) that the police later found at his home.

## C.    Verdict and Judgment

The jury was instructed on homicide, self-defense, and robbery. Among the homicide theories on which it was instructed were first degree murder under each of two different theories—(1) that the killing had been willful, deliberate, and premeditated and (2) that it constituted felony murder. As noted above, the jury returned a verdict in which it found Romero guilty of first degree murder and arson. Judgment was entered accordingly, a sentence was imposed, and Romero timely appealed.

## II.
## DISCUSSION

Romero contends that the record reveals the first degree murder verdict rested exclusively on a finding that the killing had been willful, deliberate, and premeditated and that no substantial evidence supported that finding *or* a finding of felony murder. "In evaluating a claim that a conviction lacks sufficient evidence, ' "we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019 (*Wear*).) " ' "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' " (*Ibid.*) "[R]eversal is required only if ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' " (*Id.*, at p. 1020.) As has oft been said: " '[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court*"—or, in this case, the jury—"*believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363 (*Ortiz*).)

"Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*Wear, supra*, 44 Cal.App.5th at p. 1020.) "Nevertheless, there

6

must be 'substantial evidence,' that is, evidence that is ' " 'reasonable . . . , credible, and of solid value.' " ' " (*Ibid.*) "In particular, a reasonable inference from the evidence ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " ' " (*Ibid.*)

## A.    Two Different Theories of First Degree Murder

Turning to Romero's specific contentions, we begin with the observation that the unlawful killing of a human being with malice aforethought is murder. (Pen. Code § 187, subd. (a).) Such a murder can be classified as *first* degree murder (1) if it is perpetrated by means of a willful, deliberate, and premeditated killing or (2) if it is committed in the perpetration of certain specified felonies, including robbery. (*Id.*, § 189, subd. (a).) Whereas the intent requirement associated with a charge of first degree murder based on the first of these two theories obviously requires an examination of the defendant's mental state vis-à-vis *an intent to kill*, the intent requirement associated with such a charge based on the second theory (known as felony murder) requires only a specific intent—formed " 'either before or during the commission of the acts that caused the victim's death' "—to commit one of the specified felonies. (*Wear, supra*, 44 Cal.App.5th at p. 1021.)

Because each of these theories *by itself* can support a conviction of first degree murder, the theories need not be set forth in separate counts, and jurors presented with both theories may return a verdict of guilty on a count of first degree murder without unanimously agreeing as to which of the two theories supports that verdict. (*Wear, supra*, 44 Cal.App.5th at p. 1020.) In keeping with this approach, "[g]enerally speaking, '[w]hen a jury is instructed on two theories of first degree murder, a first degree murder verdict will be upheld [even] if there is insufficient evidence as to one of the theories.' " (*Id.*

7

at p. 1021.)  The reason for this is that, "[i]n such cases, where 'the inadequacy of proof' as to one of the theories of first degree murder is 'purely factual,' it is presumed that the jury is 'fully equipped to detect' the deficiency and must [therefore] have relied on the other, factually valid theory."  (*Ibid.*)  "But this presumption does not apply if there is '*an affirmative indication in the record* that the verdict actually *did* rest on the inadequate ground.' "  (*Ibid.*, italics added.)

## B.     Romero's Arguments

### 1.    The Contention that the First Degree Murder Verdict Rested Exclusively on a Finding that the Killing Had Been Willful, Deliberate, and Premeditated

Romero contends there is an affirmative indication in the record that the jury premised its first degree murder verdict exclusively on a finding that the killing of Cervantes was willful, deliberate, and premeditated.  He bases this contention on three notes to the trial court in which the jury asked for a readback of two witnesses' testimony and for an opportunity to view two knives recovered from the scene of the crime that had been displayed during witness testimony.  According to Romero:

> "The common thread in . . . these two witnesses' testimony is that both of [them] confirmed [Romero]'s intent in coming to the house that morning had been to retrieve property he believed was at the house and both testified about previously seeing knives at the house that were similar to the knives found in the kitchen after Cervantes [had been] killed.
>
> "[¶] . . . [¶]
>
> "While . . . multiple witnesses . . . testified about the cash . . . [these two] were the . . . [only] witnesses who testified both about [Romero]'s desire to retrieve his property from the house *and* about knives being at the house.  The jury's focus from their requests for readback coupled with their request to view the knives is an

8

> affirmative indication [that it] concluded the murder
> was . . . the result of premeditation and deliberation as
> opposed to the alternate theory of felony murder."

We are not persuaded.

Reliance on the jury notes is unwarranted for each of two reasons. First, the two witnesses on whose testimony a readback was requested—Mateo Milian Quesada and Sandy Landin—were *not* the only witnesses who testified both about Romero's stated desire to retrieve his property from the house and about knives at the house. A third witness—Rodrigo Guerrero Hernandez—*also* testified about those two topics. Thus it cannot reasonably be inferred that the jury notes affirmatively indicated that the first degree murder verdict rested exclusively on one theory of first degree murder rather than the other or both.

Second, even if Milian and Landin *had* been the only witnesses to testify both about Romero's stated desire to retrieve his property from the house and about knives at the house, the jury's requests would not amount to what *Wear* refers to as "an affirmative indication" that the verdict rested on just one of the two theories of first degree murder presented to the jury. (See *Wear, supra*, 44 Cal.App.5th at p. 1020.) To understand why this is so, one need only compare the substance of the notes from the jury in this case to the substance of the notes that led our Supreme Court to reverse a murder conviction in *Wear*. In *Wear*, "the jury sent a note to the trial court that stated, 'The jurors are split over (1) malice aforethought [and] (2) felony murder. Some agree that (1) has been proven but not (2). [¶] Some believe (2) has been proven but not (1)." (*Id.* at p. 1021.) Then, "[t]he following day, the jury informed the trial court that it was split, by a vote of eight to four." (*Ibid.*) As the court observed, these notes made it "clear that some of the jurors accepted the premeditated-murder theory and others accepted the

9

felony-murder theory." (*Ibid*.) "Thus," the court held, "the record contains affirmative indications that some jurors convicted Wear of first degree murder based on the felony-murder theory and others did so based on the premeditated-murder theory" and, for this reason, a reversal would be required in the absence of substantial evidence supporting both theories. (*Id*. at p. 1022.)

The jury notes at issue here, by contrast, merely stated: (1) "Please, we request Mateo Milian testimony from Day 2 @ 9:50," (2) "Testimony of Sandy Landin read back [from] Monday 7/3/23 1st thing. Thanks," and "We request the two knives for inspection. Thanks."

Whereas the jury notes in *Wear* affirmatively revealed that the jury in that case split over two different theories in arriving at its first degree murder verdict, the jury notes in the present case reveal no such thing. Hence the first degree murder conviction in the present case may be affirmed if substantial evidence supports *either* (1) a theory that Romero killed Cervantes willfully, deliberately, and with premeditation *or* (2) a theory that he killed Cervantes in the perpetration of a robbery—that is, that he committed felony murder.

## 2. The Contention that No Substantial Evidence Supported a Finding of Felony Murder

As to felony murder, Romero contends his conviction could not rest on *that* theory because "there was . . . insufficient evidence to show he formed an intent to steal from Cervantes before he killed Cervantes." Again, we are not persuaded.

Romero is correct as a matter of law that, to support a felony murder conviction in the context of a robbery, the evidence must reveal that an intent to steal the victim's property was formed *before* or *during* the fatal encounter. (*Wear, supra*, 44 Cal.App.5th at p. 1022 [" ' " 'if the intent arose only *after* the

10

use of force against the victim, [then] the taking will at most constitute a theft' " ' " (italics added)].)  But rare is the felony murder case in which the only intent to steal that substantial evidence supports is an intent that arose only after, rather than before or during, the fatal encounter.  Indeed, as our Supreme Court has repeatedly said:  " ' " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' " ' "  (*People v. Potts* (2019) 6 Cal.5th 1012, 1030 (*Potts*); accord *Wear, supra,* 44 Cal.App.5th at p. 1022; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 166 (*Letner*); *People v. Hughes* (2002) 27 Cal.4th 287, 356–357 (*Hughes*).)  In similar fashion, the court has repeatedly observed that, " '[i]f a person commits a murder, *and after doing so takes the victim's wallet,* the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' "  (*Hughes,* at p. 357; *People v. Marshall* (1997) 15 Cal.4th 1, 35; see also *People v. Navarette* (2003) 30 Cal.4th 458, 499 ["While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property."])

These authorities notwithstanding, Romero contends the evidence here was insufficient to support an inference that he formed an intent to steal from Cervantes before Cervantes died.  Thus for example he asserts that "[t]here was scant evidence to show [he] was in dire straits financially;" and that, "if he had wanted to steal from Cervantes, he would not have left so much . . . money behind."[1]  In addition, he points out that, on the day of the

---

[1]    A wallet with $652 in cash was found in a pocket of the pants Cervantes was wearing when he died, and thousands more were found in Cervantes's bedroom closet and in a drawer or drawers of the other dresser located in his bedroom.

fight, he approached the house openly, in broad daylight, and parked his truck where anyone could see it in front of the house, and that, the evidence bearing on an intent to steal "showed at most that the decision to take the drawer was an afterthought, not something [Romero] intended to do while he was fighting with Cervantes."

But the test on appeal is not whether substantial evidence supports a finding that the appellant *wishes* had been made at trial, but rather whether such evidence, contradicted or not, supports findings that *actually* were made at trial. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925.) Hence, if substantial evidence to support a felony murder conviction appears in the record, then (as we have noted above) " '*it is of no consequence that the* [jury] *believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' " (*Ortiz, supra*, 208 Cal.App.4th at p. 1363.)

Here, our Supreme Court's endorsement of the proposition (noted above) that, " ' " 'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' " ' " (*Potts, supra*, 6 Cal.5th at p. 1030; *Wear, supra*, 44 Cal.App.5th at p. 1022; *Letner, supra*, 50 Cal.4th at p. 166; *Hughes, supra*, 27 Cal.4th at pp. 356–357) by itself could suffice to establish the requisite intent. But even beyond this, we note that the inferences for which Romero contends (see *ante*) are not the only inferences that substantial evidence supports.

Thus, for example, insofar as a motive is concerned, substantial evidence supplied at least three independent grounds on which the jury could infer that Romero felt strapped for cash on the morning of Cervantes's death: (1) the admission that Romero and his wife had been arguing about his having taken money she had intended for a different purpose; (2) the physical evidence that Romero had been gambling in the days leading up to the events

of October 4, 2020; and (3) the testimony that Romero had owed money to Penalosa and that Penalosa's daughter had asked Romero to repay it. As for the money "left . . . behind," the jury could easily have attributed that circumstance to the feelings of "panic" and "trauma" that Romero said he had experienced after killing Cervantes, or to an assumption that all of the cash Cervantes was storing in the house would be found in just one location (i.e., in the dresser drawer that Romero took from Cervantes's bedroom), rather than in multiple locations in the house.

As to the fact that Romero did not comport himself furtively outside the house, this could indeed be explained by an inference that his only intent before meeting Cervantes at the gate had been to collect property, or to ask Cervantes for a loan, or perhaps both. But, such an inference would not be incompatible with a further inference that a more sinister intention developed during his time inside. Similarly, the inference that the decision to take the drawer was merely an afterthought that did not occur to Romero until after the fight is not the only inference that might be drawn in the circumstances. Moreover, even if it *were* the only inference that might be drawn, it would be compatible with an inference that Cervantes might have yet been alive when Romero took the drawer and its contents. Indeed, in this latter regard, there were at least three statements by witnesses from which the jury might have drawn such an inference: one in which a police officer testified that "the fire department tried to do life-saving measures there on scene, but . . . quickly determined they had to transport him to a hospital"; a second in which Romero, when asked whether Cervantes was "still breathing" after the fight, did not testify that he was not then breathing or that he couldn't tell, instead simply stating "I wasn't thinking at that moment"; and a third in which Romero, when asked if he had thought about

13

calling 911 before driving away, did not assert that the call would have been pointless, instead testifying that "I thought about it when I got to the pickup truck" and then "got even more scared and . . . left."[2]

On the basis of the foregoing analysis, we conclude substantial evidence supported the conviction of Romero for first degree murder on a felony murder theory.[3]

---

[2]     Romero also contradicted himself at times and made statements that, in the context of other evidence, might have prompted the jury to conclude his version of events was not credible.  For example, he testified inconsistently as to whether the property he said he had come to the house to retrieve belonged to him or to someone else.  In addition, regarding the two knives shown to the jury, he testified that he had wielded only one of them during the fight, that the other had been wielded by Cervantes throughout the fight, and that he (Romero) had grasped that latter knife by the blade throughout the fight in order to defend himself against Cervantes.  But a deputy medical examiner opined that Cervantes's injuries had been inflicted by *both* knives, with about half of his stab wounds having been caused by a knife with two sharp edges and the other half having been caused by a knife with just one sharp edge.

[3]     Because we find no affirmative indication in the record that Romero's first degree murder conviction rested on a theory that the killing of Cervantes was willful, deliberate, and premeditated (see *ante*) and because we find that substantial evidence supported that conviction on a felony murder theory (see *ante*), we need not (see *Wear, supra*, 44 Cal.App.5th at pp. 1020–1021) and do not reach Romero's argument that substantial evidence did not support the theory that the killing of Cervantes was willful, deliberate, and premeditated.

14

### III.
### DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.